72 Cal.Rptr.3d 398 (2008)
159 Cal.App.4th 1202
In re G.S.R., et al., Persons Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Gerardo R., Defendant and Appellant.
No. B197000.
Court of Appeal of California, Second District, Division Eight.
January 8, 2008.
*399 Kimberly A. Knill, Laguna Beach, under appointment by the Court of Appeal, for Appellant Gerardo R.
*400 Raymond G. Fortner, Jr., County Counsel, James M. Owens, Assistant County Counsel, and Judith A. Luby, Principal Deputy County Counsel for Respondent.
Aida Aslanian, Glendale, under appointment of the Court of Appeal, for Minors.
FLIER, J.

SUMMARY
Principles of due process require that the juvenile court not terminate a presumed father's parental rights without first finding, by clear and convincing evidence that the father is unfit. Because no such finding was made in this case, and based on our conclusion the court improperly terminated parental rights based on a father's poverty, we will reverse the order terminating parental rights and remand for reconsideration whether a proper basis for such termination exists, and if not, for renewed efforts aimed at returning the children to their father's custody. We also conclude reversal of the order terminating parental rights is required, and remand the matter, so the juvenile court may properly determine whether the Indian Child Welfare Act (ICWA), 25 U.S.C. section 1901 et seq., governs this proceeding.

FACTUAL AND PROCEDURAL BACKGROUND

General background facts:
In May 2004, then eight-year-old appellant G.S.R., and his six-year-old brother, appellant G.M.R. ("Michael" or, collectively, "the boys"), were detained by respondent Department of Children and Family Services (DCFS) from their mother's custody after she was arrested for having sex with a minor. The boys were placed with their relatives, paternal grandmother Marie R., and a paternal uncle Jesus R.
The whereabouts of the boys' father, appellant Gerardo R. (Gerardo), were not known at the time. Gerardo first appeared in this action in July 2004. He told the juvenile court he had always been a part of the boys' lives, and wanted to be a good father. The court thanked him for his interest, told him to contact mother and DCFS so he could remain in the boys' lives, and informed him the children would continue to reside with Marie until mother could obtain adequate housing. The first Welfare and Institutions Code section 300 petition was dismissed in July 2004, after the boys' mother agreed to informal DCFS supervision under a family reunification plan. The mother failed to comply with that agreement. (All further statutory references are to the Welfare and Institutions Code.)
DCFS filed the operative second petition in January 2005. In its sustained form, the petition alleged the boys' mother, whose whereabouts had become unknown, had problems providing adequate care for or supervision of her children, and placed them at substantial risk of harm because, among other things she had (1) engaged in an inappropriate sexual relationship with a minor; (2) been involved a series of relationships with men who committed domestic violence against her, and (3) failed to comply with her 2004 voluntary family reunification plan, which required that she have regular contact with and find suitable housing for her children, and participate in individual counseling and parenting education.[1] The petition also alleged the mother's parental rights had been terminated after she failed to reunify with the boys' six older siblings. (Gerardo is not *401 the father of the boys' siblings, none of whom is involved in this appeal.)
Gerardo appeared at the detention hearing in January 2005, and was appointed counsel. The court was told Gerardo "was very involved with [the boys], and he [saw] them nearly every day." Gerardo wanted the boys to live with him, but he did not yet have suitable housing. He agreed they should remain in his mother's home for the time being, and was given unmonitored visitation. In February, Gerardo was found to be the boys' presumed father.
The jurisdictional/dispositional hearing was conducted in mid-March 2005. DCFS reported Gerardo became involved with the boys' mother in 1995; he was 17, she was 29. Gerardo admitted a history of alcohol abuse and occasional drug use. But, he said he had not used drugs since 1992, had completed a drug program, and had ceased drinking entirely in 2004. Gerardo had committed two acts of domestic violence, for which he completed a 12-month domestic violence program. Gerardo was unable to assume custody of the boys because he rented a room in a house that could not accommodate children. He wanted to gain custody and planned to continue working toward that goal and to obtain suitable housing. DCFS provided a January 2004 letter from an employer stating Gerardo was a very reliable employee and a committed father. He had been offered full-time work. However, he was not able to take anything other than a part-time job because of problems with childcare and mother.
A mediated agreement was reached. All but two of the allegations of the petition were dismissed against the mother, to which she pled no contest. No allegations were sustained against Gerardo, who was proclaimed to be non-offending. Both parents were offered reunification services. Gerardo was given unmonitored day and overnight visits at Marie's home and ordered to participate in a sobriety program, such as Alcoholics Anonymous (AA). DCFS was ordered to conduct an evaluation in the event Gerardo obtained housing for himself and the boys.
In June 2005, DCFS reported Gerardo had a job but was still unable to assume custody due to a lack of housing. Gerardo had attended AA meetings, participated in a special education (IEP) meeting for one child, and visited his sons regularly. The court told Gerardo to notify DCFS if he found housing, so the boys might have unmonitored overnight visits in his own home and encouraged him to "keep up the good work."
In its report for a review hearing in mid-September, a DCFS social worker said Gerardo had returned her phone calls and left her voicemail messages, but she had not been able to meet with him or confirm his attendance at AA meetings. The report noted Gerardo was non-offending and eligible to have the children placed in his care. However, based on Gerardo's "lack of follow-up," the social worker surmised he might "not be interested in caring for the children full-time." About a week after her report was written, the social worker met Gerardo at his apartment, which was an inappropriate living space for him and the boys. Gerardo was visiting the boys regularly. He had attended AA meetings for 20 weeks but stopped going a few months before. At the hearing, the court found Gerardo had partially complied with its orders, but that it would be detrimental to return the boys to their parents' care. It continued reunification services another six months.
Meanwhile, DCFS reported the boys continued to do well in Marie's care, and liked living with her. She and Jesus were meeting their needs and facilitating visits, and wanted to adopt the boys. DCFS *402 intended to initiate a home study once reunification services terminated. DCFS confirmed that Gerardo had attended some AA meetings between May and June 2005, stopped attending in early December 2005 and resumed again in January 2006. However, he had also been laid off from work. By February 2006 he had another job, but was still unable to afford appropriate housing. In her report for a March 2006 review hearing, the social worker reiterated her view that Gerardo's lack of follow-up to DCFS requests and his failure to comply fully with the court's orders to secure housing and attend AA meetings, was evidence Gerardo was "not interested in caring for children full-time." The social worker's report failed to mention that Gerardo had told her for months that he was determined to find appropriate housing and to complete the court-ordered plan, and was "not giving up this fight." Gerardo told the social worker he loved his boys and had resolved to stay strong and persevere because he knew he was able to care for and raise his sons. He also noted that, in early February he had been honored and happy to attend a ceremony at school at which one of his sons received an award for being "student of the month."
At the hearing on March 16, 2006, Gerardo requested custody, and told the court he planned to move in with Marie and care for his children. His attorney told the court the only problem Gerardo had was an inability to find suitable housing, so his custody plan was to have the boys returned to his care while he lived with his mother for a time. In the alternative, Gerardo requested additional reunification services. The boys' attorney objected because of a concern that, if Gerardo moved in, it might jeopardize the funding Marie had been able to secure for the children and Gerardo could not make up for the loss because he was unemployed at the time. In addition, Gerardo had not been attending AA meetings. The court denied Gerardo's request and found that returning the boys to their parents' custody would pose a substantial risk of detriment to their well-being. Reunification services were terminated for both parents, and the matter was set for a permanency planning hearing. (§ 366.26.)
The permanency planning hearing was scheduled for late June 2006. At that time, DCFS reported on the boys' progress in school, and noted that both were participating in individual counseling. Marie and Jesus were assessed to be proper adoptive parents, and participating in therapy and parenting classes to address some issues surrounding discipline. Both boys wanted to stay with Marie; Michael wanted to live with his mother or father if he could not stay with his grandmother. DCFS said the boys were likely to be adopted, and should remain in Marie's care. But DCFS recommended delaying termination of parental rights, because Marie's home study was incomplete. Gerardo opposed adoption. He informed the court he had lived with the children and seen them daily until April 2006, when friction developed with Jesus and interfered with Gerardo's visitation. Gerardo was worried about the children because Jesus purportedly got drunk every weekend, and drove the boys in the car while intoxicated. Since April, Gerardo had spent each Saturdays with his sons. DCFS was ordered i to investigate Gerardo's allegations and to include information from the boys and, their, therapists regarding the children's relationship with Gerardo. The hearing was continued to early August 2006.
Marie and Jesus' homestudy was complete by August, but DCFS had deferred a final decision while the family addressed concerns regarding Jesus' unrealistic expectations for and inappropriate *403 discipline of the children, and DCFS' desire to improve the relationship between Gerardo and his brother. Gerardo had been visiting the boys regularly but DCFS was unable to contact him because he was homeless. The report for the hearing was accompanied by a letter from Michael's therapist. The therapist said Michael continued to defy Marie and had nightmares once or twice weekly. His behavior hinged on his ability to see his parents every week. He was trying to adjust to life with Marie, but had trouble accepting the notion his parents would never have custody of him again; the idea made him feel abandoned and sad. The section 366.26 hearing was continued again.
By early December, Marie's homestudy had been approved; she and Jesus remained committed to adopting the boys. Gerardo objected to termination of parental rights and adoption, and argued his due process rights had been violated based on our decision in In re Gladys L. (2006) 141 Cal.App.4th 845, 46 Cal.Rptr.3d 434 (Gladys L.) He noted he was a non-offending father who had never been found unfit. He was involved in his boys' lives and had recently secured a new job, so the only obstacle to obtaining custody of his children was a lack of housing. The court requested briefs on issues raised by Gladys L., and continued the hearing.
In its brief on the Gladys L. issues, DCFS argued Gerardo had problems finding housing and had failed to attend AA meetings on a regular basis. In addition, he had been present at each hearing at which the court found it would be detrimental to return the children to his care but had not appealed any of those orders, created a stable lifestyle or obtained appropriate housing for his sons. DCFS argued the court's periodic findings of detriment were sufficient to satisfy the due process prerequisite recognized in Gladys L., i.e., that a parent's rights may not be terminated without a prior finding of unfitness. Attorneys for Gerardo and the boys' disagreed, arguing DCFS had to file a supplemental (§ 342) petition alleging Gerardo's unfitness to parent and to afford him a hearing on the issue. They also argued that a lack of affordable family housing presented the only impediment to Gerardo's ability to obtain custody of his sons, and DCFS had never made any effort to assist him on that front. Accordingly, due process required the juvenile court conduct a hearing to explore the possibility of having DCFS assist Gerardo to resolve this barrier to reunification, or to make a finding by clear and convincing evidence he was unfit to parent.
The juvenile court found it was not necessary that a section 342 petition be filed and that its prior findings of detriment were equivalent to a finding Gerardo was not fit to assume custody of his children. It noted Gerardo had agreed but failed to fully comply with the case plan that required him to attend AA meetings and locate appropriate housing. The court found the boys were likely to be adopted, and terminated parental rights.

Facts related to the ICWA:
While the first petition was pending in 2004, the boys' mother told the court that, although she was not registered, she had Indian heritage from several tribes, including the Apache, Navaho, Cherokee and, possibly, Chumash (or some other tribe beginning with "Ch"). DCFS sent identical ICWA notices to 13 tribes, the Bureau of Indian Affairs (BIA) and the Secretary of the Interior (Secretary). The notices sent to the BIA and Secretary mentioned only the Apache, Navaho and Cherokee tribes, and failed to list the mother's birth name. The notices also provided contradictory *404 information: they said the boys had possible tribal affiliations but that their mother, through whom that affiliation was asserted, had none; they also said that although the maternal grandparents lacked any tribal affiliation, it was not known whether maternal great grandparents had such an affiliation. DCFS never provided the juvenile court with signed certified return receipts. Nevertheless, on June 28, 2004, the juvenile court mistakenly stated it had "received all of the certified return receipts." The juvenile court made no ICWA determinations before the first petition was dismissed in July 2004. After the operative petition was filed in January 2005, the juvenile court indicated its belief that it had already found proper notice had been given, and there was no reason to believe the ICWA applied. Accordingly, no more attempts were made to notify any tribe, the BIA or the Secretary.

DISCUSSION

1. Due process requires a finding of unfitness before parental rights may be severed.
Gerardo and the children contend the juvenile court erred in terminating Gerardo's parental rights as a presumed father without an allegation or a finding, made by clear and convincing evidence, that he was an unfit parent. We agree.
Parents have a fundamental interest in the care, companionship and custody of their children. For this reason, they have certain due process protections in juvenile dependency proceedings. (Santosky v. Kramer (1982) 455 U.S. 745, 758,102 S.Ct. 1388, 71 L.Ed.2d 599 (Santosky).) Before the state may sever a parent's rights in his natural child, due process mandates the state's allegations be supported by evidence that is, at a minimum, clear and convincing. (Id. at pp. 747-748, 102 S.Ct. 1388.) Once the state has shown a parent unfit, the juvenile court may then assume the child's interests have diverged from those of his or her natural parent. (Id. at p. 760, 102 S.Ct. 1388.) However, "until the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." (Ibid.)
"California's dependency system comports with Santosky's requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court must have made prior findings that the parent was unfit." (Gladys L., supra, 141 Cal.App.4th at p. 848, 46 Cal.Rptr.3d 434, citing In re Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 254, 19 Cal.Rptr.2d 698, 851 P.2d 1307 (Cynthia D.).) "Except for a temporary period, the grounds for initial removal of the child from' parental custody have been established under a clear and convincing standard (see § 361, subd. (b)); in addition, there have been a series of hearings involving ongoing reunification efforts and, at each hearing, there was a statutory presumption that the child should be returned to the custody of the parent. (§§ 366.21, subds. (e), (f), 366.22, subd. (a).) Only if, over this entire period of time, the state continually has established that a return of custody to the parent would be detrimental to the child is the section 366.26 stage even reached." (Cynthia D., supra, 5 Cal.4th at p. 253* 19 Cal.Rptr.2d 698, 851 P.2d 1307.) `"The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to: the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.' [Citation.] The linchpin to the constitutionality *405 of the section 366.26 hearing is that prior determinations ensure `the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.' [Citation.]" (Gladys L., supra, 141 Cal.App.4th at p. 848, 46 Cal. Rptr.3d 434.)
Here, no judicial finding of a lack of parental fitness was made as to Gerardo. Gerardo was a nonoffending, noncustodial father, as was the presumed father in Gladys L, supra, 141 Cal.App.4th at page 847, 46 Cal.Rptr.3d 434. The boys were removed from their mother's care after her conduct alone was found to place them at risk of harm. Although Gerardo admitted a history of domestic violence and substance abuse, those issues were addressed and' resolved before the first petition was filed in 2004. The record contains no evidence and DCFS never alleged Gerardo had a problem with domestic violence or substance abuse during these proceedings, and Gerardo was never told to test for drugs or alcohol. Nevertheless, the juvenile court ordered Gerardo to attend AA meetings, which he did for some time, all the while maintaining unmonitored visitation with his sons, "without concerns" on the part of DCFS.[2]
In Gladys L., we found an order terminating parental rights violated a father's due process rights even though he disappeared for three years after the detention hearing. We did so because DCFS never alleged and the court never found he was unfit, and there was no evidence that placing the child in her father's custody would cause her detriment. (Gladys L., supra, 141 Cal.App.4th at pp. 848-849, & fn. 3, 46 Cal.Rptr.3d 434.) Gerardo's case is more compelling. He has been involved with his sons throughout their lives, before and during this dependency proceeding.[3] He always provided financial support, visited regularly, participated in the boys' schooling by helping with homework, and attending an IEP meeting and awards ceremony, and maintained contact with DCFS even when he lacked a place to live. The record strongly suggests the only reason Gerardo did not obtain custody of the boys was his inability to obtain suitable housing for financial reasons.[4] But poverty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction. As the legislature expressly stated in section 300, subdivision (b), "no minor shall be found to be a person described by this subdivision solely due to the lack of an emergency shelter for *406 the family...." Put differently, indigency, by itself, does not make one an unfit parent and "judges [and] social workers ... have an obligation to guard against the influence of class and life style biases." (In re Cheryl E. (1984) 161 Cal.App.3d 587, 607, 207 Cal.Rptr. 728.) DCFS abandoned its guard here. Time and again, the social worker pointed to Gerardo's inability to afford housing to support her view he was not interested in obtaining custody of or caring for his sons.[5] This unwarranted logical leap had potentially devastating implications. Instead of crafting a plan to help Gerardo obtain affordable housing for his family, DCFS recommended termination of services and severance of the parental relationship. The juvenile court adopted those recommendations, without providing Gerardo notice or a meaningful opportunity to address the issue of his fitness to parent. The court's failure to provide these safeguards also prejudiced the boys, who are deprived of an opportunity to develop a relationship with their biological father.[6]

2. The record does not support the juvenile court's findings of detriment.
DCFS asserts that Gerardo was found unfit by clear and convincing evidence based on the juvenile court's determinations on three occasions that it would be detrimental to place the boys in Gerardo's custody. Specifically, one order removing the boys from their parents' care, was made when Gerardo said he was not yet in a position to assume custody. And two other orders were made at hearings at which the court found it would pose a risk to the boys to be placed in Gerardo's care because he lacked housing and had skipped AA meetings. Again, with respect to the AA meetings, there is no evidence Gerardo's sobriety was ever in issue during this case, nor any evidence his failure to attend meetings posed a danger to the boys. As for the lack of housing, DCFS may not bootstrap the fact that Gerardo was too poor to afford housing, which would not have served as a legitimate ground for removing the boys in the first place, to support findings of detriment, all of which flow directly from the circumstances of Gerardo's poverty and his concomitant willingness to leave his sons in his family's care while he stayed close, maintained familial ties and worked to raise rent money. This is particularly so when DCFS might have assisted Gerardo to obtain affordable housing, but made no effort to do so.
DCFS points to the recent decision in In re PA. (2007) 155 Cal.App.4th 1197, 66 Cal.Rptr.3d 783 to support its assertion that findings of detriment, if supported by substantial evidence, may provide a basis for termination of parental rights, even in the absence of a sustained petition as to one parent. DCFS' reliance on that case *407 is misplaced. In that case, a presumed father failed to appear in a dependency proceeding until just before the section 366.26 hearing at which DCFS planned to recommend his children be freed for adoption. The father had known about the case for months, but ignored the notices he received because he did not take the case seriously. (Id. at p. 1204, 66 Cal.Rptr.3d 783.) The father denied any criminal history or a history of drug abuse, but the evidence reflected otherwise. (Id. at pp. 1204-1205, 66 Cal.Rptr.3d 783.) The father also never requested reunification services, never challenged the court's jurisdiction on any ground and took no steps to obtain custody of his daughter, other than a perfunctory request that she be placed with him in his mother's home. (Id. at p. 1209, 66 Cal.Rptr.3d 783.) At the time of the section 366.26 hearing, the father argued the court was not free to terminate parental rights because the petition never alleged he was unfit. (Id. at pp. 1210-1212, 66 Cal.Rptr.3d 783.) Our colleagues in Division Three found otherwise. They concluded that findings of detriment, if supported by substantial clear and convincing evidence, may provide an adequate foundation for an order terminating parental rights even in the absence of a jurisdictional finding related specifically to a parent. (Id. at pp. 1212-1213, 66 Cal.Rptr.3d 783.) We do not disagree with that result.
In In re P.A., the father's persistent avoidance of responsibility for his child and his failure to maintain any involvement in her life or even to visit her for years at a time, constituted substantial evidence of detriment and militated strongly against placing the child in his care, notwithstanding the absence of sustained allegations as to him.[7] This case is quite different. Gerardo has consistently demonstrated his dedication to his sons. Although the juvenile court found it would be detrimental for the boys to be placed in his care because he had not attended AA meetings as promised, there was never any showing his failure to do so posed any risk to his sons. While DCFS may desire it from an abundance of caution, participation in AA or another rehabilitation program should not be a prerequisite for a parent who has shown no problem maintaining sobriety. As for the finding of detriment based on Gerardo's lack of housing, that finding arises directly out of the fact of his poverty. The record is devoid of evidence that, but for his inability to obtain housing, Gerardo is incapable of adequately parenting his sons. This would seem to indicate he is a fit parent. At a minimum, it indicates an entitlement to an opportunity to defend himself against a factually specific charge that he is not.[8] It *408 is not up to Gerardo to prove he is a fit parent. Rather, it is up to DCFS to satisfy its constitutional burden to establish, by clear and convincing evidence, that he is not. (Santosky, supra, 455 U.S. at pp. 747-748, 102 S.Ct. 1388; Cynthia D., supra, 5 Cal.4th at p. 253, 19 Cal.Rptr.2d 698, 851 P.2d 1307; Gladys L., supra, 141 Cal.App.4th at p. 847, 46 Cal.Rptr.3d 434.)
The absurdity of a contrary result reached here is illustrated by the matter of funding for the boys' care. The juvenile court has essentially asserted jurisdiction over the children because their father lacks the funds to adequately provide for them. But, the dependency system pays foster families to help defray the cost of children placed in their care, and-subsidizes adoptive assistance payments until children reach majority. Indeed, it was the possibility that he might jeopardize Marie's funding for the children, that prevented the court from adopting Gerardo's custody plan and placing the boys in his care while he lived with them in Marie's home. It makes no sense for the government to subsidize the care of a child by relatives or strangers but not his presumed father, even though the sole impediment to placing the child in that parent's custody is the parent's dire financial condition.
Under these circumstances, we determine Gerardo's due process rights were denied by DCFS' failure to demonstrate sufficient detriment and the juvenile court's failure to find a legitimate basis for deeming him unfit. We recognize and regret the procedural and emotional difficulty of undoing this fundamental error at this stage of the process, especially since both boys are doing well "in Marie's care and she wishes to adopt them. Still, we cannot allow the process to continue on the path toward termination of parental rights without further review in the trial court. We cannot undo the process but we can pause and restart the proceedings. Accordingly, we will reverse and remand with instructions that the trial court revisit the issue of whether, based on facts and circumstances as they exist at this time, there exist legally sufficient grounds to assert jurisdiction over the boys, recognizing poverty is not such a ground. If so, and the ICWA (discussed below) is deemed inapplicable, the juvenile court shall restart the clock on reunification services and related efforts, including housing assistance, to afford Gerardo a legitimate opportunity to build a relationship with and become a full-time parent to his sons. Only in the event those renewed efforts fail may the juvenile court proceed with termination of parental rights. If the trial court determines legitimate grounds for dependency jurisdiction do not currently exist, it shall take the necessary steps to assist the boys' return to Gerardo's custody.

3. Remand is required for compliance with the ICWA.
As DCFS properly concedes, the juvenile court erred by failing to make proper inquiries as to the ICWA in this case, based on its mistaken assumptions the court had been provided signed return receipts from all appropriate tribes and the BIA in the first dependency proceeding, and that it made ICWA findings before that action was dismissed.
The notices sent were defective and confusing. The notices to the BIA and Secretary fail to mention all four tribes or bands with which the mother may have an affiliation. In addition, all the notices, including those sent to the 13 tribes, contain contradictory information. The purpose of ICWA notification requirements is to give tribes the opportunity to investigate and determine whether a child *409 is an Indian child, and to advise the tribe of the pending proceeding and its right to intervene. (In re Desiree F. (2000) 83 Cal.App.4th 460, 470, 99 Cal.Rptr.2d 688.) The failure to give any or proper ICWA notice will foreclose a tribe's ability to participate. To that end, notice requirements are strictly construed and DCFS and the court have a continuing duty of inquiry until such time as the court finds a child is not an Indian child. (In re I.G. (2005) 133 Cal.App.4th 1246, 1254, 35 Cal. Rptr.3d 427; Cal. Rules of Court, rule 5.664(c)(3).)
In this case, ICWA notice requirements were not satisfied because of the juvenile court's mistaken assumptions that proper notice had been given and findings made in the dismissed case. Remand is required to ensure compliance with the ICWA. (In re Francisco W. (2006) 139 Cal.App.4th 695, 43 Cal.Rptr.3d 171.)

DISPOSITION
The order terminating Gerardo's parental rights is reversed. The matter is remanded to the juvenile court with directions to conduct a hearing to address whether legally sufficient grounds independent of poverty currently exist to assert jurisdiction over the boys. If the juvenile court determines no legitimate grounds for jurisdiction exist at this time, it shall take the necessary steps to return the boys to Gerardo's custody. If the court determines grounds for jurisdiction exist, it shall order DCFS to comply with the notice provisions of the ICWA. If, after proper notice, the court finds the children are Indian children, the juvenile court shall proceed according to the provisions of the ICWA. If, on the other hand, the court finds the children are not Indian children, the juvenile court shall renew reunification services and related efforts, including the provision of assistance in obtaining low-income housing, to reunify Gerardo and his sons. Only in the event those renewed efforts fail may the juvenile court proceed to terminate his parental rights.
We concur: COOPER, P.J., and RUBIN, J.
NOTES
[1] The petition also alleged Gerardo had a history of domestic violence and had assaulted the mother. Those allegations were stricken.
[2] DCFS knew Gerardo stopped attending AA meetings but never assessed this as posing a risk to the boys with whom Gerardo always had unmonitored and frequent visits, and with whom he even lived for a time in Marie's home. If DCFS was concerned Gerardo posed a danger to the children, it was required to file a supplemental petition with allegations sufficient to meet the requirements of section 300 or, at least, to seek a change in the court's visitation orders. (§§ 342 & 388, subd. (a).) It never did.
[3] To support its claim Gerardo failed to show an interest in obtaining custody, DCFS correctly points out that Gerardo was "completely absent" during the first dependency action dismissed in July 2004. What it neglects to mention, however, is that DCFS had failed to locate or give Gerardo notice of that action. Gerardo said the mother disappeared with and began hiding the boys from him sometime before 2004.
[4] Expressly acknowledging that "indigency is not a legal basis for removing children from parents," the juvenile court stated these boys were removed from their parents for "other reasons." That was wrong. Although the boys were removed from their mother because her behavior endangered them, the sustained petition states no viable jurisdictional basis for removal from Gerardo.
[5] We decline DCFS' invitation to infer Gerardo purposefully perpetuated his indigency because he declined to accept a full-time job. The letter on which DCFS relies was written in January 2004 before the initial (later dismissed) dependency petition was filed. There is no evidence Gerardo had and declined an opportunity to work full-time (or at all) for that employer while this case was pending, or that such a position, if available, would have enabled him to afford appropriate housing.
[6] We reject DCFS' assertions that Gerardo waived his right to complain by failing to object to or appeal from the disposition orders, by which he agreed the boys could be placed with his mother. We cannot see the benefit of a rule that would require a parent to seek appellate review when the allegations against him have been stricken, and the only problem is that the juvenile court's focus was directed at Gerardo's sobriety, an issue that no longer existed, and a disposition plan Gerardo believed was temporary.
[7] The result in In re P.A. is not at odds with our conclusion in Gladys L., which was premised on the absence of allegations or findings the father was unfit, coupled with a record bereft of evidence the child would suffer detriment if returned to her father's custody. (Gladys L., supra, 141 Cal.App.4th at pp. 848-849, & fn. 3, 46 Cal.Rptr.3d 434.)
[8] This case, involving a presumed father who wishes but is financially unable to assume custody of his children also differs significantly from Quilloin v. Walcott (1978) 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511, on which DCFS relies. There, the Supreme Court refused to permit a mere biological father, who had shown no interest in his illegitimate daughter for 11 years and had no interest in assuming custody, to use his status as biological parent to block the adoption of his daughter by her de facto father (stepfather), with whom the child had lived most of her life, and who she knew and loved. Here, Gerardo, an involved presumed father entitled to the highest due process protections, has shown a consistent desirebut not yet an abilityto accept custody of and responsibility for his children. As such, his parental unfitness must be established by clear and convincing evidence. That showing has not been made.