165 Cal.App.4th 98 (2008)
In re P.C. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent,
v.
M.D., Defendant and Appellant.
No. G039898.
Court of Appeals of California, Fourth District, Division Three.
July 23, 2008.
*99 Ellen L. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant.
Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.
No appearance for Minors.

OPINION
FYBEL, J.

INTRODUCTION
M.D. (mother) appeals the juvenile court's order terminating her parental rights to her daughter P.C. and her son Estevan C., now ages eight and five, respectively. This case presents us with this question: Is poverty aloneeven when it results in homelessness or less than ideal housing arrangementsa sufficient ground to deprive a mother of parental rights to her children? We *100 agree with the analysis of the recent case, In re G.S.R. (2008) 159 Cal.App.4th 1202 [72 Cal.Rptr.3d 398], and hold it is not. We therefore reverse.
Although the juvenile court properly exercised jurisdiction over these children, by the time of the permanency hearing, as the Orange County Social Services Agency (SSA) admitted, the only reason the children could not be returned to mother's custody and care, at least on a temporary basis, was her lack of stable, suitable housing. Mother had completed her case plan. Any detriment to returning the children to mother's custody and care was solely due to her lack of housing, which, in turn, was due in large part to her lack of funds. Mother worked steadily, but was unable to find affordable housing in Orange County. During the reunification period, SSA failed to provide reasonable assistance to mother to obtain safe, affordable housing. We remand the matter with directions to the juvenile court to order SSA to provide further reunification services to mother, including the provision of assistance in obtaining low-income housing.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
On May 27, 2005, SSA filed a juvenile dependency petition concerning P.C. and Estevan, then five and two years old, respectively. (P.C. and Estevan will be referred to collectively as the children.) The petition alleged mother had hit Estevan with her hand on May 20, and had physically abused P.C. in the past. The petition also alleged Alejandro C., the children's father, had committed acts of domestic violence against mother in the children's presence, causing the children to suffer emotional damage. Alejandro (not a party to this appeal) was also alleged to have physically abused P.C. on several unspecified occasions. Mother was alleged to have left the children with a caretaker without means of support, without providing a medical consent, and without providing the caretaker with her whereabouts or the time of her return. Before the petition was filed, mother had disclosed to SSA that she had been homeless for about three weeks. The children were placed in a foster home.
After a contested jurisdiction and disposition hearing, the juvenile court sustained the allegations of physical abuse, domestic violence, and failure to provide necessary information to the children's caretaker, and found it had jurisdiction over the children pursuant to Welfare and Institutions Code section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect). (All further statutory references are to the Welfare and Institutions Code.) An allegation in the petition that mother was homeless and unable to provide a stable residence for the children was dismissed by the juvenile court. Although the court expressed concerns about mother's living arrangements, it acknowledged that the lack of stability in a place to live "would not be *101 such . . . in and of itself to warrant the court's assumption of jurisdiction." The children were declared dependents of the juvenile court, and reunification services were ordered.
Mother's visitation was regular and appropriate. Mother had some trouble complying with her case plan because she was working full time and her work schedule conflicted with her parenting class and counseling schedules. P.C. missed mother and stated she "wants to live with her." SSA reported that P.C. "becomes sad when she talks about [mother]." Mother was terminated from a parenting education program and individual counseling because she missed classes and appointments. After a contested hearing under section 366.21, subdivision (e), the juvenile court ordered reunification services to continue.
Mother's visitation with the children was changed from monitored to unmonitored, and her visits remained consistent and appropriate. Overnight visitation could not begin until everyone in the home in which mother was living was fingerprinted. P.C. began counseling to deal with her separation from mother. Mother received new referrals for parenting classes and counseling. She completed her parenting classes, but missed counseling sessions. In a status review report dated July 17, 2006, SSA recommended that reunification services be continued.
In a status review report addendum dated August 7, 2006, however, SSA recommended reunification services be terminated. The social worker opined mother was unable to complete the case plan due to poor followthrough. The juvenile court again ordered reunification services to continue.
Mother maintained contact with SSA, and completed individual counseling. Mother moved in with her maternal aunt and uncle in Buena Park. In January 2007, SSA made an unannounced visit to the uncle's home; he stated he did not want mother living there any longer. SSA referred mother to the Pennysaver to find adequate housing. A family unification referral was completed, but not given to mother to sign. (A family unification referral might have put mother higher on the waiting list for government-subsidized, low-income housing.)
At the 18-month review hearing in February 2007, the social worker testified mother had completed all the services required by the case plan, and acknowledged mother's housing situation was the only thing preventing the children from being returned to mother's care. Mother's behavior during visitation did not present any risk of harm to the children. SSA's policy was that all adults living in a home must be "live-scanned" before a dependent child could be returned for overnight visitation or a 60-day trial visit. *102 Mother's living situations did not work out because a resident refused to be fingerprinted, or the live scan turned up a criminal history. The social worker testified mother "was completely willing to follow [SSA's] requests and to try to move into a place where people would be approved."
The juvenile court terminated reunification services, and set the matter for a section 366.26 hearing. The court found by clear and convincing evidence that the return of the children to mother "would create a substantial risk of detriment to the physical and emotional well-being of the children." The children were returned to the Orangewood Children's Home after their foster care placement fell through.
Mother filed a section 388 petition requesting return of the children because she had obtained suitable housing. However, the live scan results of mother's roommates revealed that one of them had a lengthy criminal history. SSA opined that although mother was making $1,200 per month, she was "unable to keep track of her finances." Mother withdrew her section 388 petition based on the criminal history of her roommate.
SSA located a prospective adoptive family in Los Angeles County. The children were placed with this family in November 2007, and mother was limited to two hours per week of monitored visitation to permit the children to adjust to their new placement. The children's attachment to their prospective adoptive parent developed appropriately. SSA reported that P.C. understood the meaning of adoption and "appeared happy when told that the prospective adoptive parent wanted to adopt her and that she would not have to move again."
A contested section 366.26 hearing began on December 11, 2007. The social worker testified mother completed her case plan. The sole basis for SSA's recommendation that the children be adopted was mother's inability to obtain suitable housing. The social worker also testified she explained the potential adoption to P.C. by telling her she would get a new mother; the social worker did not tell P.C. she would not continue to have a relationship with mother.
Mother testified P.C. would typically cry when their visits ended, and tell mother she did not want to leave. Estevan would run to mother at the start of the visits. The children called mother "mom" or "mommy." After the children were placed with a prospective adoptive family, P.C. told mother she had already been adopted, but still referred to mother as "mom."
*103 The juvenile court found the children to be adoptable, and found the section 366.26, former subdivision (c)(1)(A) exception did not apply.[1] The juvenile court then terminated mother's parental rights to P.C. and Estevan. Mother timely appealed.

DISCUSSION
(1) This appeal presents a single issue: May parental rights be terminated when the only current detriment to returning the children to mother's care and custody is her inability to obtain housing acceptable to SSA? The recent case of In re G.S.R., supra, 159 Cal.App.4th 1202 is on point, and we agree with its analysis. In that case, two young boys were detained after their mother was arrested for having sex with a minor. (Id. at p. 1205.) The boys' father, Gerardo R., did not have custody, and could not be immediately located. (Id. at pp. 1205-1206.) The dependency petition was dismissed, with the mother agreeing to informal supervision under a plan of family reunification. (Id. at p. 1206.) Six months later, however, a second dependency petition was filed, alleging the mother had placed the boys at a substantial risk of harm by engaging in an inappropriate sexual relationship with a minor, involving herself in a series of relationships with men who committed domestic violence against her, and failing to comply with the earlier family reunification plan. (Ibid.) Gerardo appeared at the detention hearing and expressed interest in having the boys live with him; he did not, however, have suitable housing at that time. (Ibid.) The boys were placed with the paternal grandmother. (Ibid.)
At the joint jurisdiction/disposition hearing, the mother pleaded no contest to two of the petition's allegations; the remaining allegations against her were dismissed. (In re G.S.R., supra, 159 Cal.App.4th at p. 1207.) (The mother was not a party to the appeal, and no further mention of her is made in the opinion.) No allegations were sustained against Gerardo; to the contrary, he was found to be nonoffending. (Ibid.)
At a status review hearing, the juvenile court found it would be detrimental to return the boys to Gerardo's care. (In re G.S.R., supra, 159 Cal.App.4th at p. 1207.) Gerardo had a job, but his apartment was "an inappropriate living space for him and the boys." (Ibid.) Gerardo visited the boys regularly and had partially complied with the court's orders to participate in a sobriety program such as Alcoholics Anonymous (AA). (Ibid.)
Gerardo was laid off from his job, but found another job. (In re G.S.R., supra, 159 Cal.App.4th at p. 1207.) He was still unable to afford appropriate *104 housing. (Ibid.) The social worker reported that Gerardo's failure to fully comply with the court's orders to secure housing and regularly attend AA meetings was evidence of his lack of interest in caring for the boys. (Id. at pp. 1207-1208.) The boys were still living with the paternal grandmother, and doing well in her care. (Id. at p. 1207.) The juvenile court denied Gerardo's request to be allowed to move into the paternal grandmother's home and be granted custody of the boys. (Id. at p. 1208.) The court again found returning the boys to Gerardo's custody would be detrimental to their well-being. (Ibid.)
At the permanency planning hearing, the juvenile court found its prior findings of detriment were equivalent to a finding that Gerardo was not fit to assume custody of the boys. (In re G.S.R., supra, 159 Cal.App.4th at p. 1209.) The court thereafter terminated parental rights. (Id. at p. 1210.)
(2) The appellate court first held that Gerardo's parental rights could not be terminated without a finding, by clear and convincing evidence, of his unfitness as a parent. (In re G.S.R., supra, 159 Cal.App.4th at p. 1210.) "The record strongly suggests the only reason Gerardo did not obtain custody of the boys was his inability to obtain suitable housing for financial reasons. But poverty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction. As the Legislature expressly stated in section 300, subdivision (b), `no child shall be found to be a person described by this subdivision solely due to the lack of an emergency shelter for the family. . . .' Put differently, indigency, by itself, does not make one an unfit parent and `judges [and] social workers . . . have an obligation to guard against the influence of class and life style biases.' [Citation.] DCFS [Department of Children and Family Services] abandoned its guard here. Time and again, the social worker pointed to Gerardo's inability to afford housing to support her view he was not interested in obtaining custody of or caring for his sons. This unwarranted logical leap had potentially devastating implications. Instead of crafting a plan to help Gerardo obtain affordable housing for his family, DCFS recommended termination of services and severance of the parental relationship. The juvenile court adopted those recommendations, without providing Gerardo notice or a meaningful opportunity to address the issue of his fitness to parent. The court's failure to provide these safeguards also prejudiced the boys, who are deprived of an opportunity to develop a relationship with their biological father." (Id. at pp. 1212-1213, fns. omitted.)
The appellate court also held that the juvenile court's findings of detriment were not supported by the evidence. "As for the lack of housing, DCFS may not bootstrap the fact that Gerardo was too poor to afford housing, which would not have served as a legitimate ground for removing the boys in the first place, to support findings of detriment, all of which flow directly from *105 the circumstances of Gerardo's poverty and his concomitant willingness to leave his sons in his family's care while he stayed close, maintained familial ties and worked to raise rent money. This is particularly so when DCFS might have assisted Gerardo to obtain affordable housing, but made no effort to do so." (In re G.S.R., supra, 159 Cal.App.4th at p. 1213.)
The appellate court concluded: "Gerardo has consistently demonstrated his dedication to his sons. Although the juvenile court found it would be detrimental for the boys to be placed in his care because he had not attended AA meetings as promised, there was never any showing his failure to do so posed any risk to his sons. While DCFS may desire it from an abundance of caution, participation in AA or another rehabilitation program should not be a prerequisite for a parent who has shown no problem maintaining sobriety. As for the finding of detriment based on Gerardo's lack of housing, that finding arises directly out of the fact of his poverty. The record is devoid of evidence that, but for his inability to obtain housing, Gerardo is incapable of adequately parenting his sons. This would seem to indicate he is a fit parent. At a minimum, it indicates an entitlement to an opportunity to defend himself against a factually specific charge that he is not. It is not up to Gerardo to prove he is a fit parent. Rather, it is up to DCFS to satisfy its constitutional burden to establish, by clear and convincing evidence, that he is not. [Citations.]" (In re G.S.R., supra, 159 Cal.App.4th at pp. 1214-1215, fn. omitted.)
Our case differs from In re G.S.R. in one important respectmother, unlike Gerardo, was an offending parent. Mother's acts and omissions brought the children into the juvenile dependency system in the first place. Allegations of abuse and substantial risk of harm to the children by mother were sustained by the juvenile court. But the record is clear, and SSA correctly concedes, mother has corrected all the problems that led to the juvenile court's assertion of jurisdiction over the children. The man who committed domestic violence against mother is out of the picture. Mother completed all the parenting classes and counseling required by her case plan.
SSA agrees that the only reason it did not return the children to mother's custody and care, at least on a temporary basis, was her lack of appropriate housing. Mother's situation again differs from Gerardo's in that Gerardo was simply unable to find affordable housing. Mother's situation is more complicated. Mother found a series of living accommodations, but the children could not be released to her at those locations because the other adult residents failed or refused to participate in the required live scan tests, or were determined to have a criminal record. SSA's reports showed that every time this occurred, mother promptly sought alternate housing.
*106 The social worker's testimony at the section 366.26 hearing establishes SSA failed to do its part in helping mother find housing SSA could determine was suitable. The social worker did not timely obtain mother's signature on the family unification referral that might have moved mother higher on the low-income housing list, simply recommended mother look in the Pennysaver for housing, and admittedly was unaware of other resources to which she could refer mother for low-income housing. In this regard, the juvenile court's finding that SSA had provided or offered all reasonable services was not supported by substantial evidence.
Also in contrast to In re G.S.R., mother's living arrangements were not the sole basis for the juvenile court's original exercise of jurisdiction. The juvenile court sustained the allegations in the petition which detailed mother's physical abuse of the children and the domestic violence to which the children were exposed. But mother resolved these problems, as SSA correctly acknowledges.
SSA next argues that "[n]o further detriment finding was necessary" to terminate mother's parental rights because when the court entered its order following the joint jurisdiction/disposition hearing, it found vesting custody of the children with mother would be detrimental. If that were true, however, then no parent would ever have the incentive to try to reunify with his or her child. In the single case SSA cites in support of this argument, In re Amanda D. (1997) 55 Cal.App.4th 813, 816-817, 818-819 [64 Cal.Rptr.2d 108], the father was incarcerated, and would remain so for some time, and had unresolved problems with drugs, alcohol, and violence. He challenged the termination of his parental rights because the juvenile court had not made the necessary finding of his unfitness as a parent. (Id. at p. 818.) The appellate court concluded the detriment findings made at each of the status review hearings throughout the case sufficiently established the father's unfitness, thus meeting the requirements of due process. (Id. at p. 819.)
In this case, the juvenile court made a finding at each substantive hearing that returning the children to mother's custody would be a detriment to them. But again we must ask, what was the basis of that finding? Initially, it was based on mother physically abusing the children and exposing them to incidents of domestic violence. If mother had not completed her case plan and corrected her behavior, we would agree that the court's continued findings of detriment were tantamount to a finding of parental unfitness. But mother resolved those problems, and the later findings of detriment were based solely on mother's inability to find suitable housing.
Our conclusions herein should not be construed as a criticism of SSA's policy that before a dependent child can be returned to his or her parents, any *107 adult who will be sharing living quarters with the child must be vetted. The safety and well-being of the children in the dependency system is our primary concern, as it is the primary concern of SSA.
There is not a perfect "fix" for the problem at this point. The children have already been placed in a prospective adoptive home, and we are loath to upset the rare instance of stability in their lives. Nonetheless, we cannot permit mother's parental rights to be terminated for the reasons we have explained. The appellate court's opinion in In re G.S.R. provides an appropriate framework for what needs to happen next in this case. The court in In re G.S.R. fashioned this sensible disposition: "Under these circumstances, we determine Gerardo's due process rights were denied by DCFS's failure to demonstrate sufficient detriment and the juvenile court's failure to find a legitimate basis for deeming him unfit. We recognize and regret the procedural and emotional difficulty of undoing this fundamental error at this stage of the process, especially since both boys are doing well in [the paternal grandmother]'s care and she wishes to adopt them. Still, we cannot allow the process to continue on the path toward termination of parental rights without further review in the trial court. We cannot undo the process but we can pause and restart the proceedings. Accordingly, we will reverse and remand with instructions that the trial court revisit the issue of whether, based on facts and circumstances as they exist at this time, there exist legally sufficient grounds to find it would be detrimental to return the boys to Gerardo, recognizing poverty is not such a ground. If not, . . . the juvenile court shall restart the clock on reunification services and related efforts, including housing assistance, to afford Gerardo a legitimate opportunity to build a relationship with and become a full-time parent to his sons. Only in the event those renewed efforts fail may the juvenile court proceed with termination of parental rights. If the trial court determines it would not be detrimental to return the boys to Gerardo's care, it shall take the necessary steps to assist the boys' return to Gerardo's custody." (In re G.S.R., supra, 159 Cal.App.4th at pp. 1215-1216.)

DISPOSITION
The order terminating mother's parental rights is reversed. The matter is remanded to the juvenile court with directions to conduct a hearing to address whether legally sufficient grounds independent of poverty currently exist such that it would be detrimental to place the children in mother's care. If the juvenile court determines it would not be detrimental to do so, it shall take the necessary steps to return the children to mother's custody. If the court determines legally sufficient grounds for jurisdiction exist independent of *108 poverty, it shall renew reunification services and related efforts, including the provision of assistance in obtaining low-income housing, to reunify mother and the children. Only in the event those renewed efforts fail may the juvenile court proceed to terminate mother's parental rights.
Rylaarsdam, Acting P. J., and Moore, J., concurred.
NOTES
[1] Effective January, 1, 2008, section 366.26 was amended. (Stats. 2007, ch. 583, § 28.5.) The amendment redesignated section 366.26, former subdivision (c)(1)(A) as subdivision (c)(1)(B)(i).