Filed 5/24/13  In re L.A. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.A., a Person Coming Under the Juvenile Court Law. | B244441 (Los Angeles County Super. Ct. No. CK75770) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE A., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  Affirmed.

Frank H. Free, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Jose A. (Father) appeals from the September 26, 2012 order terminating his parental rights over L.A., contending that the juvenile court committed reversible error by failing to make a finding by clear and convincing evidence that Father was an unfit parent. We disagree because the court made a finding of detriment based on substantial clear and convincing evidence. We affirm.

## BACKGROUND

On December 29, 2008, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (g) (failure to provide) on behalf of L.A., born in 2008, and Javier M., born in 2000.[1] Father is not the father of Javier M. As amended and sustained, paragraph b-1 of the petition alleged under section 300, subdivision (b) that Leticia C. (Mother) caused a detrimental home environment by keeping marijuana and loaded handguns in the home. Also, Mother was arrested in 2008 for a probation violation for possession of illicit drugs and child endangerment. As amended and sustained, paragraph g-1 of the petition alleged under section 300, subdivision (g) that Javier's father failed to provide for Javier. The juvenile court dismissed paragraph b-2, which had alleged under section 300, subdivision (b) that Mother caused a detrimental home environment by allowing a gang member to reside in the home and by permitting gang activity in the home, resulting in the house being shot at by rival gang members. The court dismissed paragraph b-4, which had alleged under section 300, subdivision (b) that Father failed to protect L.A. by failing to provide for L.A., and paragraph g-2, which had alleged under section 300, subdivision (g) that Father failed to provide for L.A. Mother, Javier, and Javier's father are not parties to this appeal.

In December 2008, at the age of six months, L.A. was detained. After initially being placed in a foster home, L.A. was placed with maternal great-aunt, Guadalupe S., in January 2009. Father had been arrested in October 2008 for a parole violation and was

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

incarcerated at the time the petition was filed. He was later found to be the presumed father of L.A. On January 19, 2009, Father wrote a letter to the juvenile court requesting permission to attend hearings and that L.A. be placed in his custody upon his release from prison in March 2009. The next month, Father wrote another letter to the court requesting that a hearing be continued to after the date of his release.

After he was released, Father told DCFS that prior to his arrest, he had always provided for L.A. and had lived with Mother, L.A., and his two sons by two different women. He gave DCFS paystubs as proof of employment. He stated that he had asked his family to take care of Mother and L.A. while he was in prison, but due to a "'big misunderstanding . . . they (paternal relatives) didn't help her.'" Father told DCFS that he was willing to participate in a case plan to regain custody of L.A. Father had a lengthy criminal history, including arrests for spousal battery, shoplifting, petty theft, and vehicle theft. In 2004, he had been convicted of robbery and sentenced to prison for three years.

Father appeared at the disposition hearing on March 18, 2009. L.A. was declared a dependent child of the juvenile court, but Father did not request custody of L.A. The juvenile court found by clear and convincing evidence that return of L.A. to Mother would create a substantial risk of detriment to her physical and emotional well-being. The allegations against Father were dismissed. The court ordered Father to have unmonitored visits and DCFS to provide reunification services to Mother and Father. Mother was ordered to participate in random drug testing and to complete individual counseling and parenting classes.

DCFS reported that Father voluntarily attended couples counseling with Mother and had unmonitored visits with L.A. Mother and Father were unable to find work or housing. Mother missed several drug tests and was incarcerated on November 16, 2009, at which time Father stopped visiting regularly with L.A. At the urging of maternal great-aunt, Father visited L.A. "once during Christmas."

On January 20, 2010, Father was arrested for assault. At a continued hearing in June 2010, the juvenile court maintained L.A. in out-of-home care and ordered DCFS to provide further services. In June 2010, Father was sentenced to two years in prison.

3

Mother was released from incarceration in December 2010. On December 14, 2010, the juvenile court terminated reunification services for Father. Mother attended some anger management classes, but failed to complete the course and failed to show for drug tests. Mother did not visit L.A. regularly. On April 1, 2011, the court terminated reunification services for Mother and set the matter for a section 366.26 hearing to implement a permanent plan of adoption for L.A.

Upon his release from prison in September 2011, Father provided DCFS with his address and parole information. After not having visits with Father for two years, L.A. was "very reluctant" to interact with him. Subsequent visits between Father and L.A. went well, although maternal great-aunt noticed that L.A. "is often 'extra affectionate' and wants hugs and states 'I love you' more to [maternal great-aunt] when she returns home." Although initial visits were regular, Father's visits became sporadic, he had problems adhering to a visitation schedule, and he was disrespectful toward maternal great-aunt. Father did not maintain regular contact with DCFS. Father was arrested on January 24, 2012 for violation of parole by associating with another parolee and for having a gun under his bed at the home where he resided with paternal grandmother. Thereafter, Father was sent to prison. In the meantime, maternal great-aunt provided L.A. with a safe and secure environment, had a loving relationship with L.A. "that continues to flourish," and was "devoted to meeting all of [L.A.'s] needs including medical, developmental, and emotional needs." Maternal great-aunt was approved for adoption.

Father filed a section 388 petition requesting the juvenile court to order L.A. returned to his custody because Father was a "non-offending" parent in that a jurisdictional finding had not been sustained against him. He stated he had made a plan for paternal grandmother, who was currently caring for Father's oldest son, to take care of L.A. DCFS reported that although Father was a "non offending" parent, he had not been able to provide and care for L.A. during the case proceedings because he had been consistently incarcerated. Further, L.A. did not have a strong bond with Father. Prior to visits with Father, L.A. often became very quiet and subdued and did not "show

4

expressions of happiness or [get] excited when she was told she was going to visit with [F]ather and paternal relatives." After visits with Father, L.A. would cling to maternal great-aunt and repeatedly state, "'I love you,'" to her. L.A. had been placed with maternal great-aunt for the last three and one-half years, "identifies [maternal great-aunt] as 'mom,' and has a very strong, loving, and nurturing bond with her. [L.A.] also identifies [maternal great-aunt's] biological sons as her brothers, who [L.A.] also possesses a strong attachment to." L.A. was bonded to Javier, who visited maternal great-aunt on weekends. Maternal great-aunt reported that L.A. had never asked to visit Father or paternal relatives, and paternal relatives had never asked to visit or contact L.A. DCFS noted that Father has an extensive criminal history, had continued the same behaviors that resulted in his incarceration, and his criminal behaviors could make paternal grandmother's home unsafe for L.A. DCFS concluded that it would be "extremely detrimental" to L.A.'s emotional well-being to remove her from maternal great-aunt, who wished to adopt her.

On September 26, 2012, the juvenile court denied Father's section 388 petition and terminated parental rights at a contested 366.26 hearing. After the court denied the section 388 petition, Father's counsel argued that his parental rights should not be terminated because he was a nonoffending parent; he had not been ordered to complete any programs; and there was not clear and convincing evidence that Father was "unfit." Father's counsel cited *In re Frank R.* (2011) 192 Cal.App.4th 532 and *In re Gladys L.* (2006) 141 Cal.App.4th 845 in support of her argument that there was not clear and convincing evidence that Father was unfit. In response, the court stated, "The court finds by clear and convincing evidence that [L.A.] is adoptable. The court finds that it would be detrimental to return [L.A.] to her father. [¶] In the court's mind, [Father] may have been a non offending father back in December of 2008, when this petition was filed, but the court notes that [Father], at the time of disposition, did not ask for placement with his daughter. He was given an opportunity to have unmonitored visitation, placement was also considered, but [Father], when he was not in custody, was not consistent with his visitation. He was—he would go off and have no contact with [L.A.] for a large period

5

of time. Visitation got better, but then he disappeared again, and the court notes that he is currently incarcerated where he's been for the second or third time on this case, since January of 2012."

Father appeals.

## DISCUSSION

**The juvenile court's finding of detriment was based on substantial clear and convincing evidence**

Father contends that the juvenile court committed reversible error by failing to make a finding by clear and convincing evidence that Father was an unfit parent. We disagree because the court made a finding of detriment based on substantial clear and convincing evidence.

"[T]he interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations] . . . ." (*In re B. G.* (1974) 11 Cal.3d 679, 688.) *Santosky v. Kramer* (1982) 455 U.S. 745 [102 S.Ct. 1388] "'establishes minimal due process requirements in the context of state dependency proceedings. "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." (*Id.* at pp. 747–748.) "After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge." (*Id*. at p. 760.) "But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." (*Ibid.*)' [Citation.]

"'California's dependency system comports with *Santosky's* requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) "The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before

6

the court may even consider ending the relationship between natural parent and child." (*Id*. at p. 256.) The linchpin to the constitutionality of the section 366.26 hearing is that prior determinations ensure "the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself." (5 Cal.4th at p 256.)' [Citation.]

"California's dependency scheme no longer uses the term 'parental unfitness,' but instead requires the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child. [Citation.]" (*In re P.A.*, *supra*, 155 Cal.App.4th at p. 1211.)

*In re P.A.* held that termination of parental rights is proper if the juvenile court makes a finding supported by clear and convincing evidence that awarding or returning custody to the parents would be detrimental to the child. (*In re P.A.*, *supra*, 155 Cal.App.4th at p. 1212.) *In re P.A.* held that the parental rights of a parent against whom a jurisdictional finding has not been made may be terminated upon a finding of detriment by clear and convincing evidence. (*Ibid*.) This is so because a jurisdictional finding is made by a preponderance of the evidence—rather than clear and convincing evidence— and therefore cannot be used as a basis for terminating parental rights. (*Ibid*.) Therefore, even if a dependency petition had alleged the unfitness of a parent, the order sustaining the petition would be inadequate to terminate parental rights without a subsequent finding of detriment by clear and convincing evidence. (*Ibid*.) In *In re P.A.*, the father was nonoffending because a jurisdictional finding had not been sustained against him. But the juvenile court had made a finding of detriment by clear and convincing evidence both at the disposition hearing and at a hearing denying the father family reunification services. And the Court of Appeal noted that DCFS reported that the father "had not maintained any involvement in [the minor's] life, he had not provided support for the child and he had not seen the child for two and a half years." (*Ibid*.) The Court of Appeal affirmed the juvenile court's order terminating the father's parental rights, concluding that the findings of detriment were sufficient findings of the father's unfitness. (*Ibid*.)

7

*In re G.S.R.* (2008) 159 Cal.App.4th 1202 agreed with the holding of *In re P.A.* that "findings of detriment, if supported by substantial clear and convincing evidence, may provide an adequate foundation for an order terminating parental rights even in the absence of a jurisdictional finding relating specifically to a parent." (*In re G.S.R.*, *supra*, 159 Cal.App.4th at p. 1214.) The court in *In re G.S.R.* noted, "In *In re P.A.*, the father's persistent avoidance of responsibility for his child and his failure to maintain any involvement in her life or even to visit her for years at a time, constituted substantial evidence of detriment and militated strongly against placing the child in his care, notwithstanding the absence of sustained allegations as to him . . . ," distinguishing it from the case before it, where DCFS failed to demonstrate sufficient detriment and the juvenile court failed to find a legitimate basis for deeming the father unfit. (*Id.* at pp. 1214, 1215.)

Here, the juvenile court made findings at the disposition hearing by clear and convincing evidence that returning L.A. to Mother's custody would be detrimental. But Father did not request custody at the disposition hearing and the court was not required to make findings of detriment relating to him. (§ 361.2, subd. (a) [if noncustodial parent requests custody, child placed with parent unless finding of detriment].)

Nevertheless, we conclude the juvenile court made a finding of detriment based on substantial clear and convincing evidence. During the section 366.26 hearing, Father's counsel argued that there was not clear and convincing evidence that Father was unfit, adverting to *In re Frank R.*, *supra*, 192 Cal.App.4th 532, and *In re Gladys L.*, *supra*, 141 Cal.App.4th 845, two cases in which the orders terminating parental rights were reversed because the juvenile court did not make findings by clear and convincing evidence of detriment. In response, the juvenile court here stated, "The court finds by clear and convincing evidence that [L.A.] is adoptable. The court finds that it would be detrimental to return [L.A.] to her father." Although the court did not repeat the specific term "clear and convincing evidence" in the sentence regarding its finding of detriment, as it did in the preceding sentence, we can imply from the record that the court found it would be detrimental to place L.A. with Father. (*In re Z.K.* (2011) 201 Cal.App.4th 51, 67 ["To

8

support the termination of mother's parental rights, the department must point to specific *evidence* from which we can reasonably imply a finding by the juvenile court that it would be detrimental to place the minor with mother."].)

In concluding that it would be detrimental to return L.A. to Father, the juvenile court noted that Father was nonoffending but had not asked that L.A. be placed with him at the disposition hearing; Father had not been consistent in his visitation, even though he had been granted unmonitored visitation; Father did not contact L.A. for long periods of time when not incarcerated; and Father was currently incarcerated. The record supports the court's finding of detriment. Although Father attended the disposition hearing in March 2009, he did not request custody of L.A. Father's visits to L.A. stopped when Mother was incarcerated on November 16, 2009. Only at the urging of maternal great-aunt did Father visit L.A. during Christmas in 2009. Thereafter Father was incarcerated in January 2010 and sent to prison in June 2010. On Father's release in July 2011, L.A. was reluctant to interact with him. L.A. did not have a strong bond with Father and did not express happiness in learning that she was to visit him, but rather became quiet and subdued. Although Father initially visited regularly, his visits became sporadic, he did not adhere to a visitation schedule, and he did not maintain regular contact with DCFS. Subsequently, he was arrested in January 2012 for violation of parole. Meanwhile, L.A. had become strongly bonded to maternal great-aunt to whom she would cling and repeatedly tell she loved upon returning from visits with Father, and who provided a safe and secure environment for L.A. In sum, there is no doubt that placement of L.A. with Father would be detrimental to her: Father had not had custody of L.A. since she was an infant, had not availed himself of the opportunity to maintain involvement in her life or visit her regularly, and had been incarcerated for much of L.A.'s life.

We conclude that the juvenile court's finding of detriment was based on substantial clear and convincing evidence.

## DISPOSITION

The juvenile court's order terminating Jose A.'s parental rights is affirmed.

NOT TO BE PUBLISHED.

MALLANO, P. J.

We concur:

CHANEY, J.

JOHNSON, J.