Filed 7/29/14  In re Z.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Z.M.-R., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TIMOTHY R.,<br><br>        Defendant and Appellant. | A139514<br><br>(Contra Costa County<br>Super. Ct. No. J1000729) |

## I. INTRODUCTION

Timothy R., minor Z.M.-R.'s father, challenges the denial of his petition for modification of the court's previous orders terminating reunification services and setting a permanent plan hearing. (Welf. & Inst. Code, §§ 388, 366.26.)[1]  At a combined hearing on father's petition and the selection of minor's permanent plan, the juvenile court denied the petition, selected adoption as minor's permanent plan, and terminated father's parental rights.  Father contends that the juvenile court abused its discretion in denying his modification petition. We reject this contention and affirm the juvenile court's orders.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Z.M.-R. was born May 2, 2010.  At the time, her 18-year-old mother, R.M., was a dependent child living in a foster home.  Parents had a history of domestic violence and

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

on May 4, father reportedly hit mother in the face, breaking her nose and blackening her eye. She was treated for her injuries at a hospital and released. On May 7, social workers from the Contra Costa County Bureau of Children and Family Services (Bureau) interviewed mother. Mother equivocated about whether father was responsible for her injuries, which occurred in the minor's presence, but stated that father physically attacked her when she was six months pregnant. Mother agreed to have no further contact with father and to seek a protective restraining order against him for herself and her child.[2]

## A. First Petition

On May 17, 2010, the Bureau filed a juvenile dependency petition alleging the minor came within section 300, subdivision (b) as a result of domestic violence between the parents. Mother and the Bureau stipulated to juvenile court jurisdiction based on father's infliction of domestic violence requiring medical attention on mother during her pregnancy and shortly after the minor's birth. The court sustained the petition on that basis at the jurisdictional hearing, which father did not attend.

At the dispositional hearing on August 19, 2010, the Bureau recommended, and the court ordered, that the minor remain in mother's care on a family maintenance plan. Father was not present, as he was incarcerated.

## B. Supplemental Petition

On January 7, 2011, the Bureau filed a supplemental petition (§ 387) alleging mother had failed to enroll in a domestic violence treatment plan, engage in individual therapy, complete a parenting class, and "maintain a stable and suitable residence for herself and her child." The minor was detained. Father was denied visitation.

On March 2, 2011, the supplemental petition was amended to add allegations that mother and father were continuing to have contact with each other, resulting in ongoing domestic violence. According to the social worker's report, on January 15, 2011, mother

---

[2] Mother obtained a restraining order against father on March 7, 2011. It expired February 24, 2014.

went to see father, who was staying with his mother, Ms. R., in Antioch. When she arrived, they began to kiss. Although she told father she did not want to have sex, she allowed him to perform oral sex on her; they had consensual sexual intercourse until she told him she wanted him to stop because she would miss her bus. When mother tried to leave, the two got into a physical altercation in which father strangled mother until she lost consciousness and kicked her in the mouth. The police were called by Ms. R. Father ran off. Mother was cited by police and driven by them to the BART station. Mother was picked up at the West Oakland BART station by her sister, who called an ambulance. Mother was taken to Highland Hospital where she told a police officer she had been raped and beaten by father.

The officer arrested father for domestic violence and a probation violation at Ms. R.'s apartment. At the jail, he gave a statement to police in which he stated he asked mother to visit him because he was concerned about how she was coping since the Bureau took their child away. She came in through the back door and immediately grabbed a knife from the kitchen. They had consensual intercourse. Mother became extremely emotional about the child, and threatened to kill herself with the knife. He stopped her from doing so. Mother stated she wanted to fight, and hit him in the mouth. He did not hit her during the fight. He left when the police were called because he was on probation.

Another officer interviewed Ms. R., who said she heard banging on her back door and noises coming from her kitchen consistent with someone rifling the utensil drawer, which contained knives. She called the police. She recognized mother's voice and believed mother was trying to stab her son, based on what she heard, but she did not see anything. The police were aware there was "a long history of documented assaults perpetrated by [father] against [mother]."

On March 14, 2011, mother pleaded no contest to one amended count alleging she had failed to complete her court-ordered Family Maintenance Plan, and continued to have

contact with father until January 15, 2011.  The court found the amended count true and dismissed the remaining allegations of the supplemental petition.

The disposition hearing was held April 18, 2011.  The Bureau's report recommended services for both parents.  The minor, now 10 months old, was "on track developmentally," and did not present with any mental or emotional issues at that time.  She was in a licensed foster home in Contra Costa County.

The disposition report noted father was in custody from January 16, 2011 until March 16, 2011.  He had "an extensive criminal history involving violence from November 29, 1996 to January 15, 2011."[3]  He was staying with his mother pending his enrollment in a residential program on March 31.  However, father was shot in the foot on March 30 and had to delay his entry into the program.

Among other things, father's case plan required him to notify the social worker immediately of any change of address or phone number; initiate monthly contact with the social worker; maintain a stable living situation for six months, attend and demonstrate progress in a county certified domestic violence prevention plan; visit with his child; engage in general counseling; and participate in a parenting education program.  The case plan envisioned completion by September 30, 2011.  The court ordered supervised visitation of one hour monthly.  Father made his first visit on April 7.

## C.  Six-Month Review

The matter came on for six-month review September 19, 2011.  The Bureau recommended continued services to both parents.  The minor was still in a licensed foster home in Contra Costa County.  The minor, now 16 months old, appeared to be on track

---

[3]  The dispositional report listed "burglary, auto theft, petty theft, domestic violence, a restraining order, intent to terrorize, robbery, battery on a person, forgery, receiving stolen property, inflict corporal punishment on a spouse/cohabitant, vandalism, annoying phone call:  obscene /threat, failure to pay fare on public transit system, failure to appear after written promise, possession of an assault weapon, possession of marijuana for sale, driving with a suspended license, obstructing public officer, failure to test, and false imprisonment."

developmentally and did not present with any mental or emotional problems. An alternative relative placement, in case mother failed to reunify with the minor, had been identified.

Father was currently either in compliance with, or making progress toward, his case plan objectives. For example, he had maintained a stable living situation for six months and initiated monthly contact with the social worker. He had enrolled in a domestic violence/anger management program through STAND on June 29, 2011. Father had supervised visitation with the minor twice a month, and the visits went well. He drug-tested once a month. He had been given referrals for parenting classes, but he had yet to provide verification of his enrollment. He stated he was "in favor of having [his daughter] placed with a relative until he is able to adequately provide for her." The court adopted the Bureau's recommendation and continued the matter for a 12-month review hearing.

## D. *Twelve-Month Review*

In October 2011, mother gave birth to a son. In November 2011, father was incarcerated for some period of time on a parole violation. Nevertheless, in a report dated October 2011, the Bureau recommended continued services to both parents.

The 12-month review hearing was held April 26, 2012. In advance of that hearing, in a status review report dated March 5, 2012, the Bureau initially recommended the court terminate reunification services for mother and set a section 366.26 permanency planning hearing. In January, mother had expressed a wish to give up her daughter for guardianship.

Z.M.-R. resided in the home of her paternal cousin in San Joaquin County. Now 22 months old, she had been referred to the Regional Center on February 29, 2012 for evaluation of possible language delays. She did not present with any mental or emotional behaviors "outside of being in the beginning stages of the 'Terrible Two's.' "

5

In February 2012, father had a expressed a wish to obtain custody of his daughter. He had consistently visited with the minor twice a month in San Joaquin County and the visits continued to go well. He stated he was taking anger management classes; however, he had yet to enroll in parenting classes and individual therapy. The social worker was "uncertain why [father] has failed to fully engage in Case Plan services to obtain custody of [Z.M.-R] prior to this time."

In an addendum report, the Bureau withdrew its previous recommendation for termination of reunification of services in light of mother's change of heart; as of March 2, 2012, she no longer wished to relinquish her daughter for a guardianship. The Bureau recommended setting an 18-month review hearing.

On April 24, 2012 father reported he was currently homeless, but was attending post-traumatic stress disorder (PTSD) and anger management counseling sessions through the Pittsburg Health Department. He had yet to enroll in a parenting class. He had last visited his daughter on April 5, having been unable to coordinate with the foster parents for a scheduled visit on April 19.

The court found that exceptional circumstances and a probability the child would be returned to the physical custody of a parent warranted extending reunification services.

### E. Eighteen-Month Review

In a status review report dated July 9, 2012, the Bureau recommended termination of reunification services to mother and setting a section 366.26 hearing. Z.M.-R., now 26 months old, remained in the her paternal cousin's home in San Joaquin County. According to the social worker, she was in good health, and "appear[ed] to be on track developmentally," speaking in two to three word sentences and able to understand simple directions. No mention was made of the referral to the Regional Center for evaluation of a possible speech delay.

Mother, now involved with a new live-in boyfriend, was experiencing mental and emotional problems and was on the brink of losing her apartment due to frequent visits by the police after reports of domestic violence. Father had not been in contact with the Bureau during this reporting period and his current circumstances were unknown. However, his probation officer reported a warrant for his arrest had issued on May 23, 2012 for threatening the security officer at his anger management program in Concord. He was dropped from the program and failed to complete it. The probation officer had not heard from him since she had informed him that the warrant was about to be issued. He had failed to comply with court orders; and he had partially complied with his visitation plan. His participation in general counseling and parenting classes, if any, was not noted.

A contested review hearing commenced August 9 and continued on August 22, September 24, November 8, November 16, November 20, and November 29, 2012. Father was present on November 20 only.

At the hearings on November 16 and 20, 2012, the social worker testified she began to suspect the minor might have a language delay during the summer of 2012 because the minor did not speak much. She thought it should be checked out further. However, no assessment had been done because the current caretaker in Ceres had transportation problems. This caretaker was not interested in providing a permanent placement for the minor. As a result, the minor was going to be moved soon.

At the conclusion of the hearing on November 20, the court once again found that exceptional circumstances and a probability the child would be returned to the physical custody of a parent warranted extending reunification services.

Services for father were not addressed. However, at a hearing held on November 29, 2012, the court terminated services to father.

7

## F. Twenty-Four Month Review

In a status report dated January 10, 2013, the Bureau again recommended termination of mother's reunification services and the setting of a section 366.26 hearing. Mother had been expelled from her residence due to ongoing police involvement precipitated by mother's violent behavior. She had ceased to engage in her case plan activities.

On December 10, 2012, the minor had been placed in a licensed foster home in San Joaquin County, where she was thriving. The foster parents were willing to adopt the minor if mother was unable to reunify with her.

A contested 24-month review hearing was held on February 6 and 8, 2013. The court terminated mother's reunification services and scheduled a section 366.26 hearing for June 2012. The court also ordered the Bureau to assess the minor for speech and developmental cognitive services.

Father appeared at the hearing on February 6, testified, and presented documentary evidence showing he had completed 19 sessions of STAND's domestic violence treatment program since re-enrolling in the program on November 21, 2012. According to STAND's facilitator, he appeared to be benefitting from the program. Father also reported to STAND that he had completed 20 group sessions with Dr. Frank.

## G. Request to Change Court Orders (§ 388)

On May 23, 2013, six months after his parental rights were terminated, father's counsel filed a written request to reinstate father's reunification services, vacate the section 366.26 hearing, and order the minor placed with her paternal grandmother, Ms. R. Attached to the request was documentation from STAND showing that father had completed a 52-week domestic violence program on April 24, 2013. According to STAND representative Olivia Pacheco, father "has been an active member of the group, he has been appropriate, open to feedback, interested in learning and has given good

feedback to other group members. He appears to be making better life and relationship decisions. He appears to have benefitted from the program."

In support of the motion, counsel explained that after being shot in 2011, father suffered from PTSD and needed therapeutic intervention. His efforts to participate fully in services were adversely affected by his condition. As a consequence of the verbal argument he had with a security guard at one of his classes, his probation was violated and he spent a month in custody. He was released in September of 2012, but he was required to reapply for all of his case plan services and medical coverage. As a result, he was not able to receive medication or therapeutic intervention until January 2013. Since then, he had been receiving both and his condition had dramatically improved, allowing him to make great strides despite not having reunification services in place.

He was in good standing with his probation and had no new incidents of domestic violence. He had been in a stable relationship with his girlfriend for 18 months. The verbal argument with the security guard was his only criminal incident and that had occurred a year earlier.

In addition to successfully completing 52 weeks of an anger management program, father was on track to receive a certificate for completing a parenting course the following week. He consistently visited with his daughter. Father did not have a permanent residence but, as of October 2012, he had sought placement at various homeless shelters, which were full. He had vouchers that allowed him to stay at hotels pending space availability at shelters. He had applied for supplemental security income (SSI) and had a hearing scheduled for September 3, 2013. With SSI benefits, he would be able to obtain housing and financial assistance. He was not living at his mother's home, which had been the sole basis for rejection of his mother as a relative placement for his daughter.

In addition, counsel alleged the minor was not safe in her new placement. She had been brought to visits on more than one occasion "filthy and with sores on her body."

According to counsel, Z.M.-R. was not as bonded to her current caretakers as she was to father and paternal grandmother and placement with paternal grandmother while father "continue[d] to make strides" would be in her long-term best interest.

## H. Combined Section 388 and 366.26 Hearing

The hearing on father's motion to modify orders based on a change of circumstances was held on June 10, 2013. Father testified he believed he was in a different position that day as compared to the day his services were terminated in that he was "just more calm . . . I know what my future is going to be. And I've completed anger management class. I've been doing my parenting class. I've been in compliance with my probation officer. I see her every week. I visit [Z.M.-R.] every chance I get. . . . [¶] . . . [I'm] trying to receive SSI now. Probably going to be getting it in September. So I feel like my life is definitely headed towards the right direction." In his anger management class he "learned tools on how to deal with stressful situations and . . . how to deal with people trying to push my buttons and . . . relax myself and count to ten. . . . I learned a lot of good stuff that's s definitely helped me today in my everyday life." For example, he had learned to ignore it and focus on the big picture rather than the short term when people push his buttons. He was still taking parenting classes, but he had already learned that kids are not responsible for their behaviors, and you had to be patient and work with them as a loving, caring person.

Father explained that he had been diagnosed with PTSD in June 2011 when he was 30 years old. He had been seeing a therapist regularly for a year, except for a month-long incarceration in September 2012. Father felt he had made "small progress" in addressing his PTSD and was taking Wellbutrin for it. He believed his PTSD had negatively affected his ability to complete his reunification services.

Prior to his diagnosis, he did not know what was wrong with him. He felt suicidal, depressed, frustrated, abused, oppressed, neglected, and "just everything negative." He had felt those symptoms all his life. He had been physically abused by his own father

starting at the age of five, and had been suicidal, depressed, and afraid of his father until the age of 15. At age 15, he was incarcerated at the California Youth Authority, where "they kind of gave me some education" and "I really started getting my life back together." His mother tried to get help, but in those days the police viewed domestic violence differently: "[T]he police would come and nobody was bleeding, nobody was cut, they leave. Just argument and stuff wasn't enough." His mother did put him in counseling when he was young, and they went to family counseling for a month when he was 13.

These negative feelings had prevented him from being employed in the past. He still experienced these feelings, but to a lesser extent. If he did not get SSI, his second alternative was to find work through the plastering union. However, his injury from getting shot in the leg in 2011 prevented him from standing up for more than an hour. The injury plus post-traumatic stress kept him from being employed now, but he understood he would have to do something. What had changed for him was that he was more stable now, knew where he was headed in life, knew he wanted to have Z.M.-R. in his life, did not get into trouble, and was staying away from people who got into trouble. With the exception of the argument with the security guard, father had not had any police contact since January 2011 in connection with Z.M.-R.'s mother.[4]

He visited regularly with his daughter and the visits went well. She called him "Daddy". Currently he was visiting her in Stockton. Previously, he had visited consistently when she was in Ceres. All of his visits were supervised.

_____

[4] Father explained he was incarcerated for a probation violation after he "got into a verbal altercation with a security guard at my anger management class." Father arrived an hour early for the class with his fiancé, and the security guard accused him of having sex with her in his truck during that time. The argument did not get physical, nor did he raise his voice; but the security guard called the police. Father thought it would be best for him to leave before the police arrived, and he did so. His probation was violated because it was considered a police contact, even though he was not there when the police arrived.

11

Father believed his daughter was being physically abused and neglected in the foster home. He had heard the foster mother was getting $2,000 a month to care for his daughter; he believed the foster mother was just taking care of his daughter for the money.

Father believed it would be in his daughter's best interest that he be given more time to reunify because "she wouldn't have to worry about being dirty all the time, and she wouldn't have to worry about somebody just pushing her off because they want a paycheck. I'm willing to take [Z.M.-R.] for free."

However, he did not presently have housing. He stayed in a number of places with friends in Oakland and Pittsburg. Because he was homeless, he also received shelter vouchers when there was no room for him in the shelter. Each voucher was worth $50 for a hotel room. Since that was not enough money to rent a room for a week, he usually paid the voucher to one of his friends to let him stay there for a few nights. He was homeless because he did not have any income to pay rent, and he could not stay with his mother because she did not want him staying with her, and he did not have any other friends or relatives who would let him live with them all the time. He could not stay with his fiancé because she already had her 17-year-old daughter, her sister, her mother, and a niece living with her. He felt that things would change when he went to court September 3 for his SSI hearing. With that income he would be able to get an apartment.

Father was not asking for immediate placement of his daughter with him, but it was his intention to eventually have her placed with him once his housing was in place. He wanted his daughter placed with his mother temporarily until he was able to take care of her himself. However, that morning his mother had told him her apartment was flooded.

Father cared for Z.M.-R. the first month after she was born, but she never lived with him in a house. She has always been cared for by others. He has been homeless the whole time she has been a dependent.

12

## I. The Court's Ruling

Based on the testimony and the evidence, the court found that more than reasonable efforts had been made to evaluate the paternal grandmother's home for placement, but she had "not at all been a willing participant in home assessment to see whether or not she would be an appropriate placement for the child." Accordingly, the court denied father's request to place Z.M.-R. in her home. That ruling has not been challenged on appeal.

As for father's section 388 motion, the court acknowledged that father had made some progress and agreed "it's a changing circumstance situation." The court also acknowledged father had participated in a 52-week batterer's course. But the court found the dispute with the security guard noteworthy and father's explanation for his probation violation not "at all" reasonable.

The court continued: "I don't think the Court can lose sight of the circumstances that brought this case to the Court's attention. This is a case involving very significant issues of domestic violence, very serious injuries and allegations of rape. [¶] So I can't make this ruling in a vacuum. I have to look at the case how it presents itself. And this young girl has essentially been a dependent most of her life. And I believe, quite frankly, this case has gone on way too long. [¶] I don't believe it's in the best interest of this child to continue services to father at this time. Father remains homeless. He has no permanent residence. He has no income. He hopes he might have social security by September, he's not sure that he will have it. If he doesn't receive it, then he's going to try to get a job through the union. [¶] He was raised himself in a home that had many issues of abuse . . . . [¶] So given the fact that this is simply changing circumstances, Dad doesn't have a home, he's never had anything other than supervised visits, the child has never lived with Father since she's been cognizant of her surroundings, I don't find that it would be at all appropriate to grant the 388 motion. [¶] I do not think it's in the minor's best interest to grant that motion and offer further services to Father at this time. [¶]

13

Rather, I think it's in the child's best interest to proceed on a permanent placement plan given what is presented to this Court. So the father's motion is denied. [¶] I find that he has failed to meet the burden of proof as it relates to that motion."

The court also found by clear and convincing evidence that Z.M.-R. was likely to be adopted and ordered both father's and mother's parental rights terminated. Father timely appeals from both orders.

### III. DISCUSSION

Under section 388, a parent may petition to modify a previously issued court order in a dependency proceeding on the basis of changed circumstances or new evidence. However, "[n]ot every change in circumstance can justify modification of a prior order. The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citation.]" (*In re S.R.* (2009) 173 Cal.App.4th 864, 870, citing *In re Daijah T.* (2000) 83 Cal.App.4th 666, 674 [changes in parental circumstances that make reunification desirable may justify modification of an order terminating services].)

We review a juvenile court's order granting or denying a section 388 petition for abuse of discretion. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612; *In re A.S.* (2009) 180 Cal.App.4th 351, 358.) We may not substitute our own judgment for that of the juvenile court; reversal is warranted only when the juvenile court "exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re A.S., supra,* 180 Cal.App.4th at p. 358.) "The denial of a section 388 motion rarely merits reversal as an abuse of discretion. [Citation.]" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

Here, the minor was under the age of three at the time of removal. Ordinarily, when a child under the age of three years old is removed from parental custody, reunification services are not to exceed a six-month period. (§§ 361.5, subd. (a)(1)(B), 366.21, subd. (e); see *Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 611-612.)

In this case, father received 18 months of reunification services; mother received 24 months. It is not an abuse of discretion to deny a section 388 petition that "alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point," because granting such a petition "does not promote stability for the child or the child's best interests. [Citation.] ' "[C]hildhood does not wait for the parent to become adequate." ' [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Where, as here, a section 388 petition is filed "on the eve of the section 366.26 permanency planning hearing[,] the child[ ]'s interest in stability [is] the court's foremost concern and outweigh[s] any interest in reunification. [Citation.]" (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594.)

"In evaluating whether the petitioner has met his or her burden to show changed circumstances, the trial court should consider (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. [Citation.]" (*In re A.A., supra,* 203 Cal.App.4th at p. 612, citing *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*).) The parent must also demonstrate that the requested modification would be in the best interests of the dependent child. The party seeking the modification bears the burden to prove both of those requirements by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(C); see also *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

Relying on the factors identified in *Kimberly F.*, father argues the court abused its discretion in this case because he had resolved the sole issue that led to the dependency – namely, domestic violence – by completing a 52-week domestic violence/anger management course with positive comments from program staff, by refraining from

15

engaging in domestic violence for two and a half years, and by avoiding contact with mother. He also argues he has "taken extraordinary steps" to treat his mental health and criminal justice problems by getting counseling and medication on his own and by being in compliance with his probation for nine months.

Father takes issue with the court's finding that his completion of a 52-week batterer's program did not resolve the domestic violence issues which precipitated the dependency. The court acknowledged that father had "participated in," and not merely attended, the program. The final progress report after completion of the program rated as "good" (but not "excellent") father's acceptance of responsibility for past and present abusive behavior, behavior showing commitment to constructive personal change, appropriate participation in group sessions showing respect for facilitators, group members, probation officers, social workers, police, and the superior court, constructive change in beliefs, and developing strategies to prevent reoccurrence of violent and abusive behavior. However, father's awareness of using abusive behavior in the past and present, and his empathy for the victims of his past and present abusive behavior was merely "adequate," while his awareness of the effects of violence on children and others was somewhere on the continuum between "adequate" and "good." Taken together with the court's rejection of father's explanation of his run-in with the security guard (which occurred after 31 of the 52 sessions), and its skepticism about the true reason father's probation was violated, this evidence supports a conclusion that father had yet to fully come to terms with his violent behavior. The record supports the court's view that father's understanding of his past abusive behavior and its effect on family was evolving, but incomplete.

Father also charges that the court's decisionmaking was tainted by its consideration of the unproven allegations of rape made by mother to police and hospital personnel at the beginning of the dependency. We disagree. In our view, the court's mention of the rape allegations does not indicate the court accepted the allegations at face

16

value, but rather that the court took them – along with the seriousness of mother's injuries – as indicative of the fact that "[t]his is a case involving very significant issues of domestic violence." Given the intensity of the domestic violence involved here, we cannot say it was an abuse of discretion for the court to conclude that father's progress in ameliorating the cause of the dependency, while commendable, was not sufficient.

Father also argues that his daughter's bond to him was greater than the bond to his caretakers. It is true father had visited his daughter consistently when he was not incarcerated, and that she had been in the concurrent foster home for six months. However, so far as this record shows, father never visited more frequently than twice a month, and all of his visits were supervised. Z.M.-R. had never lived in his home and, insofar as father remained homeless, it was not reasonably likely that Z.M.-R. would be able to live with him in the foreseeable future. While there undoubtedly was a bond between father and daughter, we cannot say the juvenile court abused its discretion in concluding that the parent-child bond should not interfere with this three-year-old child's chance for a permanent adoptive home.

Finally, citing *In re G.S.R.* (2008) 159 Cal.App.4th 1202, father argues that his indigence is not a valid basis for concluding he could not regain custody of his daughter. However, *In re G.S.R.*, *supra*, is distinguishable. In that case, father was the non-offending noncustodial parent, and the court's sole basis for asserting juvenile court jurisdiction was his failure to find suitable housing due to his poverty. That is not the case here.

Furthermore, from the inception of this dependency in 2010, father's case plan called for him to maintain a stable living situation. He has not done so since the six month review hearing in September 2011. He still was far from being able to do so, although he had developed some contingency plans for securing enough income to allow him to rent an apartment. In the meantime, the minor had been placed in at least three foster homes in three years. The court did not abuse its discretion in concluding that,

17

given Z.M.-R.'s urgent need for a permanent plan, father's contingency plans were too little, too late.

We recognize father has made significant strides toward overcoming the issues that led to Z.M.-R.'s removal, and that his efforts are all the more commendable because he undertook them on his own initiative and without the benefit of reunification services. However, given the history of this protracted dependency, we conclude the juvenile court did not abuse its discretion in finding that father's circumstances were changing, rather than changed, and that his efforts did not outweigh the minor's need for stability and permanency.

## IV. DISPOSITION

The juvenile court's orders denying the section 388 motion and terminating parental rights are affirmed.

_____
Dondero, J.

We concur:

_____
Humes, P.J.

_____
Banke, J.

18