Filed 3/5/15  In re K.C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | B254770 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK61593) |
| Plaintiff and Respondent, | |
| v. | |
| Elizabeth C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra Losnick, Juvenile Court Referee.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant, Elizabeth C.

Merrill Lee Toole, under appointment by the Court of Appeal, for Respondent, K.C.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jeanette Cauble, Senior Deputy County Counsel for Plaintiff and Respondent.

This is an unusual case. K.C., now 12 years old, has twice been the subject of child dependency proceedings due to her mother's long-standing drug use. After the second dependency proceeding was initiated in 2011, mother made a remarkable turn-around: She entered drug treatment and, by all accounts, has been sober for approximately two years. She also participated in psychological counseling and parenting education and regularly visited her daughter. In short, by any measure, mother has fully complied with her case plan.

The problem, however, is that K.C. is suffering from post-traumatic stress disorder, does not trust mother, and does not want to return to her care. Between 2005 and 2007, and again from 2011 to the present, K.C. has been well cared for by her maternal grandparents, in whose home she is thriving. K.C. has repeatedly told the juvenile court she wishes to remain with her grandparents because she believes mother will not remain sober, fears mother's live-in boyfriend, and feels anxious and "crazy" in mother's presence. In contrast, she says she is calm and happy with her grandparents, is doing well at school, and is "finding out how smart I really am." Under these circumstances, the juvenile court found that returning K.C. to mother would create a substantial risk of detriment to K.C.'s physical and emotional well-being, and it thus terminated mother's family reunification services and parental rights. Mother appeals.

We affirm. Although we applaud mother's exceptionally hard work and her success in turning her life around, we conclude that substantial evidence supports the juvenile court's finding that returning K.C. to mother would be detrimental to her physical and emotional well-being and that terminating mother's parental rights does not violate her right to due process. Accordingly, the juvenile court did not abuse its discretion in terminating mother's family reunification services and parental rights and ordering K.C. freed for adoption by her grandparents.

# FACTUAL AND PROCEDURAL HISTORY

## I.    Prior Detention

K.C., born August 10, 2002, is the child of Elizabeth C. (mother) and an unknown father.  In November 2005, K.C. was detained by the Los Angeles Department of Children and Family Services (DCFS) after mother was arrested for being under the influence of methamphetamines.  In February 2006, the court sustained two allegations under Welfare and Institutions Code section 300, subdivision (b):[1]  (1) mother had a history of substance abuse and was a current user of methamphetamines, which created a detrimental home environment and placed K.C. at risk of physical and emotional harm; and (2) on November 22, 2005, used methamphetamines while caring for K.C., left K.C. alone in a building without adult supervision, and was arrested for child endangerment. K.C. was placed with her maternal grandfather, Edward L., and his wife, Olga L. (maternal grandparents).

Mother completed nine months of residential drug treatment in December 2006, and K.C. was returned to her care in March 2007.  The juvenile court terminated jurisdiction in September 2007.

## II.    Current Detention

In July 2011, shortly before K.C.'s ninth birthday, DCFS received a report that K.C. appeared malnourished, and that mother and her boyfriend fought frequently and slapped K.C.  Mother initially denied recent drug use and agreed to drug test, but on August 19, 2011, told the children's social worker (CSW) that her test would be dirty for "speed and weed" (methamphetamines and marijuana).  At a team decision meeting the same day, mother appeared to be under the influence of drugs.  K.C. was detained from mother and placed with maternal grandparents.

Mother told the CSW that she had been using marijuana and methamphetamines daily for about two months.  She said she was willing to enroll in drug treatment and

---

[1]    All subsequent undesignated statutory references are to the Welfare and Institutions Code.

would do anything to avoid having her child detained. She admitted arguing frequently with her boyfriend, but denied any physical fights or abuse of K.C.

On September 7, 2011, the court ordered K.C. detained with maternal grandparents in Oceanside, California. The same day, DCFS filed a juvenile dependency petition that, as subsequently amended, alleged that K.C. had suffered, or there was a substantial risk K.C. would suffer, serious physical harm or illness because of mother's substance abuse and failure to adequately supervise or protect K.C.: "[Mother] has a history of illicit drug use and abused methamphetamines and marijuana, which periodically renders the mother incapable of providing regular care and supervision of the child. On 9/1/11, the mother was under the influence of illicit drugs while the child was in the mother's care and supervision. The mother's illicit drug use endangers the child's physical health and safety, placing the child at risk of physical harm and damage."

### III.    Jurisdiction and Disposition

The Jurisdiction/Disposition Report, dated October 13, 2011, noted that mother had been using drugs since she was 16 or 17 years old. She admitting relapsing about two months earlier, in July 2011, and tested positive for amphetamines, methamphetamines, and marijuana on September 1, 2011. Mother had a criminal drug history dating back to 1991, and the family had twelve DCFS referrals between 2003 and 2008. Mother said she attended inpatient drug treatment in 2007 and then lived in a sober living house for seven months. In 2009, mother attended an outpatient treatment program and then lived in another sober living home.

Olga L., the maternal step-grandmother, said that mother had a long-standing drug problem that she had never successfully conquered. She and maternal grandfather "saw the signs of not thriving 1) [K.C.]'s hygiene was terrible when my husband and I saw her at her home in Lakewood; hair dirty, not bathed regularly 2) her weight has been low and she usually has soda pop and candy and chips not eating healthy 3) she became increasingly angry at school and with her mother to the point the police were called to the park when [K.C.] acted out screaming at her mother. Onlookers were very concerned and police were called. [K.C.]'s last report card had a [note] from the principal of Park

4

Elementary School that [K.C.] does need help and there was concern. [¶] I have received calls from [K.C.] with her just crying on the phone and not speaking."

On October 13, 2011, the court sustained the amended petition and found that K.C. was a person described by section 300, subdivision (b). The court further found by clear and convincing evidence pursuant to section 361, subdivision (c), that substantial danger existed to K.C.'s physical or emotional health and there were no reasonable means to protect K.C. without removing her from mother's physical custody. The court ordered DCFS to provide mother with family reunification services, and ordered mother to participate in random, weekly drug testing, a parenting education class, and individual counseling to address case issues.

## IV.   Six Month Review

The six-month Status Review Report (dated April 12, 2012) said mother was attending out-patient drug treatment and regularly visiting K.C. in Oceanside. As of late March, mother had completed an outpatient drug treatment program and had tested negative for drugs on a weekly basis. Mother continued to attend 12-step meetings and to work with her sponsor, and had completed parenting and anger and stress management classes.

Maternal grandparents told the CSW mother had a history of relapsing after extended periods of sobriety, and they expressed skepticism that mother would remain sober. They reported that K.C.'s performance at school was excellent and she was making friends quickly. They said mother visited K.C. regularly, but "talks only about herself and does not pay attention to [K.C.]."

K.C. told the CSW she was very happy living with her grandparents and wanted to remain with them. She said she loved her school, teachers, friends, and extra-curricular activities. K.C. wrote a letter to the court, dated April 12, 2012, in which she said she did not want to live with her mother. She wrote: "When I am over there I am just like this: Crazy. [Scribbled drawing.] And when I am over here I am just like this: calm [depiction of straight line]. And I am happy here & mad and alone over there in LAKEWOOD. I am choosing to stay over here in OCEANSIDE. My mommy will

5

always be my mommy but I am done solving her problems. And my future is more important to me. . . . Also when I was 4 years old my mommy said 'I will get my acked [*sic*] together' and now I am back over here because she broke her promise and now she is doing the same thing again ackting [*sic*] like she's doing good. But I know the truth[.]"

DCFS opined that it was "highly concerned due to mother's long history of substance abuse and relapse after case closure. The mother has shown a pattern of sporadic sobriety with relapse for many years. . . . [¶] . . . [¶] CSW conducted an assessment of future risk of harm to child [K.C.] and the result was high. Based on the above information DCFS recommends continuation to provide the mother with an opportunity to continue her recovery and display adequate relapse prevention skills."

At the April 12, 2012 review hearing, the court ordered that K.C. remain placed with maternal grandparents and that mother continue to receive family reunification services.

## V. 12-Month Review

The 12-month Status Review Report, dated October 11, 2012, said mother had been compliant with her court-ordered programs of random drug testing, drug and alcohol counseling, anger management, parenting classes, and individual counseling. Mother had consistently visited K.C. every other weekend and worked closely with her sponsor. Mother continued to randomly drug test and her tests were negative for drugs and alcohol. Mother maintained regular contact with the CSW and continued to attend outpatient drug treatment groups. Mother's sponsor said she and mother met every week, and mother was currently in step nine of her 12-step program. Mother's sponsor said mother had been sober a year and was doing very well.

K.C. was reported to be thriving in maternal grandparents' home. She was doing well in school and was involved in extracurricular activities such as baton and hip hop. Maternal grandmother reported that K.C. had shown significant progress in reading and completing her homework, and K.C. said she loved math and reading. DCFS reported K.C. was well-adjusted to the home and bonded to her grandparents.

6

The CSW monitored a September 2012 visit between mother and K.C., and observed that K.C. had very little interaction with mother. The CSW observed mother "to make several attempts to have a conversation with her daughter. However, the child did not appear to be interested. [The CSW] observed [K.C.] to be rude towards her mother and not following directions. [K.C.] had to be redirected for her behavior several times by her mother."

In August 2012, K.C. told the CSW she was not ready to have unmonitored visits with mother and did not want to return home because she had a "better life" in Oceanside and feared being taken away again. In a letter to the court, K.C. said she wanted to remain with her grandparents because she did not feel safe with mother and "I . . . don't feel calm because she's always out of control and everywhere. She never can focous [sic]. I don't trust my mom because she is ALWAYS lying to me in my face." Mother told the CSW she wanted K.C. to return to her care, but said she was willing to wait if K.C. was not ready.

Based on the foregoing, DCFS "does not recommend that [K.C.] be returned home. . . . It appears that [K.C.] is very concerned about having unmonitored and overnight visits with her mother and returning home to her mother. [K.C.] has expressed to [the CSW] that she will have a better life in Oceanside with her grandparents and she has stated she does not want to live in Lakewood because she does not like her mother's boyfriend. It is recommended that ongoing mental health services be provided to the child in order to address the child's concerns."

At the October 11, 2012 status review hearing, the court ordered that K.C. remain placed with maternal grandparents. It further ordered that K.C. submit to a psychological assessment and participate in individual counseling, and that mother and K.C. participate in conjoint counseling when deemed appropriate by the child's therapist.

VI.     18-Month Review

The December 5, 2012 Interim Review Report said K.C. was receiving weekly therapy, in which she was making progress. Maternal grandmother reported that K.C. had begun exhibiting behavioral issues after visiting mother, and recently had begun

refusing to call mother or speak to her on the phone. In January 2013, K.C.'s therapist reported that K.C. did not want to return home and expressed great anxiety about reunifying with mother. The therapist did not recommend conjoint counseling with mother.

The 18-month Status Review Report (March 11, 2013) said K.C. continued to do well in her grandparents' home, but had not regularly been attending therapy. The CSW monitored several visits between mother and K.C., noting that K.C. was often either disinterested or rude to mother. During one visit, the CSW "observed the mother to initiate a conversation with her daughter with very little response from the child. [The CSW] observed [K.C.] to have an attitude with her mother and she was observed to be talking back to her mother and was even observed to spit in her mother's face when she did not get her way. [The CSW] observed the mother constantly redirecting her daughter for her inappropriate behavior with little response from the child." During another visit, the CSW observed that mother was affectionate with K.C. and had age-appropriate expectations, but K.C. appeared angry and manipulative with mother and engaged in constant power struggles with her. Mother told the CSW she was concerned that maternal grandmother and aunt were telling K.C. negative things about her and said she was ready for unmonitored visits, but K.C. said she did not want unmonitored visits because she was afraid mother would not bring her home.

In a letter to the court, K.C. said she did not want to return to mother because she feared abuse. Further, since living with her grandparents, her performance in school had improved dramatically. She said: "I used to speak like a 5 yr old. I used to write like a 5 year old. And now my teacher says that I am writing at a 5th grade level. I am learning how to P.L.F. P.L.F. means pay atention [*sic*], Listen, and Focus. Now that I know how to P.L.F. I am able to learn anything, and even follow the directions. I never knew how important this was. And know [*sic*] I do know how important P.L.F. is. I never got taught this in Lakewood. Know [*sic*] that I am learning everything new, I am finding out how smart I really am. . . . I am trying really hard to P.L.F. in school, but I am so scared to haved [*sic*] to leave my beautiful life in Oceanside."

DCFS noted that mother had made significant progress with court-ordered programs, including parenting, individual counseling, random drug testing, drug and alcohol treatment, and had consistently visited K.C. on a bi-weekly basis. Despite K.C.'s opposition, it therefore recommended that K.C. be returned to mother. DCFS said: "During the course of this case, mother has been very cooperative and she has demonstrated desired behaviors. The mother has addressed the issues that led to the opening of the case. Mother is currently enrolled in culinary school and she continues to attend NA meetings. Mother appears to have support from her mother, sponsor, and her significant other.

"Based on [the CSW's] assessment, it appears that the mother and child [K.C.] are struggling to establish a positive relationship with each other based on the strained relationship the mother and her family have between each other. . . . [¶] . . .The department recommends that child [K.C.] be returned home to her mother with conjoint counseling and family preservation in place to address the issues regarding their relationship. The department understands that the child has expressed her feelings about not wanting to return home to her mother. However, it is in the best interest that the child be returned to her mother under family maintenance services."

At the March 11, 2013 hearing, the court set the matter for a permanency review hearing (§ 366.22) and ordered that conjoint counseling begin when K.C.'s therapist believed her ready.

## VII.   Permanency Review Hearing (§ 366.22)

The Interim Review Report, dated May 14, 2013, reported that K.C. did not want unmonitored visits with mother because she feared mother would not bring her back. Mother and K.C. had not begun conjoint therapy because K.C. was seeing a new therapist who could not yet evaluate K.C.'s readiness.

During a Team Decision Meeting on May 10, mother's NA sponsor and pastor said they had seen dramatic changes in mother since she stopped using drugs and began attending church. The pastor said he had seen mother take responsibility for her life and within his church by leading a teen group, and mother's sponsor said she had seen

9

mother's significant development and growth over the previous 20 months. Mother apologized for her past actions and said she would be more than willing to travel to Oceanside for conjoint counseling. The CSW stated she believed mother had matured and her support system had grown. DCFS therefore recommended that K.C. be returned home to mother and provided family maintenance services and conjoint counseling.

The court held a permanency review hearing on May 14, 2013. Mother's counsel told the court that although mother wished to have K.C. returned to her, she understood that K.C. wished to remain with her grandparents. Counsel said: "Mother did go to her daughter this morning and tell her daughter that she understands and accepts that she is living with relatives in San Diego and that she is accepting of that placement. The mother understands that by doing that . . . the court will proceed to terminate family reunification services, that the court will proceed to set a .26 proceeding to determine what a permanent plan would be for her daughter. [¶] The mother does have the hope that by accepting the placement and not continuing to fight, that that will reassure her daughter and provide her daughter with stability in her placement . . . so that there can be a more natural relationship between the mother and her daughter that may lead to the mother and the daughter enjoying time together that is not monitored. And in the hopes of achieving that, the mother is asking that the court order that the conjoint counseling between her daughter and the mother continue to be an order of the court and that the court consider allowing a new therapist to be in place so that the person would address the counseling or the therapy between the child and the mother and still leave in place the young lady's therapist and her own where they can process the other issues and so that conjoint counseling can begin. [¶] This is very difficult for the mother."

Mother then addressed the court directly: "I'm not agreeing that I – I want to terminate my rights, my reunification. . . . [¶] . . . [¶] . . . But that's what I have to do, so . . . ." Mother's counsel continued: "I think what the mother is expressing to the court is what I'm attempting to say is not an easy choice, and this is the beginning of that process. The mother does not want to lose her daughter. . . . [¶] . . . [¶] . . . The mother does want to be the mother, and the mother does want to have a relationship with her daughter. But

10

she also understands and acknowledges that her daughter has made very clear what her feelings are, and that that's not something that the mother can control. . . . [¶] . . . [¶] . . . And the mother, the way she expressed it to me was because she [can't] control it, her struggle is going to be to accept it as taking place on God's time . . . and not on her time."

The child's counsel told the court that although she appreciated mother's compliance with court-ordered reunification services, such compliance was "not the sole concern before the court. [The] focus of the dependency court is on the well-being of the child, and there is a long line of cases that hold that question of whether to return a child to the parent[']s custody is not governed solely by whether the parent has corrected the problem that required court intervention in the first place. Rather, the court must consider the effect that the return would have on the child. . . . [¶] . . . [¶] . . . Now, [K.C.] has written and submitted numerous letters to the court in which she expresses fear, fear of being kidnapped, and that's also expressed in the social worker's report of March 11th, '13, on page 11. She is fearful of being around the mother's live-in boyfriend. She has a fear of returning to an abusive home, and those are her words. [K.C.] doesn't trust the mother at this point, and she doesn't trust the mother's boyfriend. She doesn't feel safe, and that's also indicated in the report from October 11th of 2012. . . . [¶] . . . [¶] . . . [K.C.] is clear in her words, in her actions. She doesn't wish to return to her mother's care. She is sometimes inappropriate during visits with the mother, and I see that as an act of a desperate child who has no control over her future but knows what she wants and just doesn't know how to get there."

After hearing argument, the court ordered reunification services terminated. It explained:

"This is a very difficult situation, and I applaud the mother for the actions that she's now taking. I think it is very difficult to have to be in this situation with your daughter, but I find that [K.C.'s counsel's] argument is compelling given the letters that [K.C.] has written, what she's discussed with her therapist, the social worker, her attorney. She is just not ready for whatever reason to live with her mom and to go back to a relationship that she may have had previously.

11

"And I agree with the term 'God's time' because I do feel that time is what will heal this relationship, and nothing that I can do to force it is going to help. In fact, I think it would hurt the situation.

"I do intend to keep the conjoint counseling order in effect. I think that that is the best bridge to get this relationship where it needs to be. . . .

". . . I did read and consider the [DCFS reports], along with the letters and arguments that counsel have made to me today, and I am not in agreement with the Department's recommendation.

"I do feel that there would be a substantial risk of detriment to return this child today by more than a preponderance of the evidence."

The court therefore terminated reunification services, ordered permanent placement services, and set a termination hearing under section 366.26; it also advised mother that she had seven days to file a writ petition challenging its orders.

## VIII.  Section 388 Petition

Mother filed a section 388 petition on August 22, 2013. Mother said that since the last hearing, she and K.C. had not done any conjoint counseling, and the "family is being distant with me and I would like to gain reunification with daughter so to do therapy [*sic*]." Mother asked the court to order K.C. home and to terminate its jurisdiction or, alternatively, to order further reunification services. She contended the change was in K.C.'s best interests because "I feel she is being coached about staying out there and she is not having any communication with me. I feel that is not o.k. for her health and emotional wellbeing."

On September 4, 2013, the court denied the petition without a hearing because mother had not demonstrated changed circumstances or that the proposed change was in K.C.'s best interests.

## IX.  Section 366.26 Termination Proceedings

DCFS filed a section 366.26 report on September 10, 2013. It noted that according to K.C.'s therapist, "[K.C.] does not open up about her mom. [K.C.] is avoidant and angry with her mom and the child has resentment towards her [mom] for

12

things that have happened in the past. [K.C.] is not ready to move forward with her mom. There is a slow progress in therapy and [K.C.] is working on building trust with me. There is a long history of trauma and the child has not received any treatment until now. [K.C.] feels safe where she is and she appears to be bonded with her aunt and grandparents. The topic of conjoint counseling with mom would not be productive at this time because the child is not ready. This can damage what is being worked on in therapy. There is betrayal, [K.C.] does not want to be with her mom and I don't see that changing in the near future. I have spoken to [K.C.]'s mother regarding my recommendation of not having conjoint counseling at this time."

K.C. was noted to be affectionately attached to her maternal grandparents who "have done an excellent job of meeting the child's needs thus far. It is believed that the [grandparents] are capable of meeting the [child]'s physical, emotional, educational, and developmental needs on a long term basis."

K.C. wrote to the court on November 12, 2013, again asking to remain with her grandparents. Among other things, she said: "I still love my mommy, but in my heart I know she [cannot] be a real mommy, and take care of me like my grandparents can. I love my life how it is. My life is perfect, but if I go back my life will be ruined. . . . Another thing I wanted to do is thank you for letting my grandparents adopt me out. Thank you judge. Thank you for believing in me."

A psychological assessment dated February 14, 2014, diagnosed K.C. as suffering from post-traumatic stress disorder. It stated that K.C. acknowledged "experiencing trauma, specifically witnessing her mother's drug use as well as experiencing physical abuse by her mother." K.C. "verbalizes a lack of trust in mom and seems to have a level of caution/mistrust of mother and mother's motivations. [K.C.] continues to verbalize a desire to continue living with her grandparents and a lack of trust in her mother and lack of confidence in mother's ability to appropriately care for her." Further, as her court date approached, K.C. "has shown an increase in her anxiety and negative behaviors. Caregiver reports that [K.C.]'s emotion/behavior regulation has worsened at home and at

13

school as the court date approaches. [K.C.] can verbalize her anxiety related to court. This seems to be a big trauma trigger for her."

The court held a contested section 366.26 hearing on March 4, 2014. At the hearing's conclusion, the court found that the evidence presented regarding the benefits of continuing K.C.'s relationship with mother did not outweigh the benefit to K.C. of a permanent home. It thus ordered parental rights terminated and K.C. placed for adoption.

Mother timely appealed.

## DISCUSSION

### I. Introduction

#### A. Statutory Overview

The Welfare and Institutions Code provides that if the juvenile court continues a dependency case beyond 12 months, it must hold a permanency review hearing within 18 months of the date the child was removed from his or her parent's physical custody. At that hearing, the court "shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create *a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.* The social worker shall have the burden of establishing that detriment." (§ 366.22, subd. (a), italics added.)

If the court does not return the child to his or her parent at the permanency review hearing, it shall order that a hearing be held pursuant to section 366.26. (§ 366.22, subd. (a).) At the section 366.26 hearing, if the court determines by clear and convincing evidence that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (c)(1).)

14

*B.     Contentions*

Although mother's primary challenge on appeal is to the termination of her parental rights under section 366.26, she does not attack the juvenile court's section 366.26 finding that it is likely K.C. will be adopted. Instead, mother's challenge is to the court's predicate finding under section 366.22 that returning K.C. to mother's custody would create a substantial risk of detriment to K.C.'s emotional well-being. As to that issue, mother contends there was not substantial evidence of likely detriment. Instead, she says that the sole basis for the court's termination of reunification services and parental rights was K.C.'s preference to remain with maternal grandparents—a preference that, according to mother, cannot constitutionally support a termination of parental rights.

As we now discuss, mother forfeited her right to challenge the juvenile court's finding of detriment because she did not timely file a writ petition after her family reunification services were terminated. In any event, we conclude on the merits that (1) substantial evidence supported the trial court's finding of likely detriment, and (2) the termination of mother's parental rights under the facts of this case does not violate federal or state due process. We therefore affirm the juvenile court's order terminating mother's parental rights.

## II.     Mother Cannot Challenge the Termination of Her Family Reunification Services Because She Failed to File a Writ Petition

Section 366.26, subdivision (*l*), provides that an order setting a section 366.26 hearing is not appealable at any time unless the parent timely filed a petition for extraordinary writ review of the order, the petition "substantively addressed the specific issues to be challenged and supported that challenge by an adequate record," and the petition was summarily denied or otherwise not decided on the merits. (§ 366.26, subd. (*l*)(1); see § 366.26, subd. (*l*)(2).) Failure to timely file a writ petition, to substantively address the specific issues challenged, or to support that challenge by an adequate record "shall preclude subsequent review by appeal of the findings and orders made pursuant to this section." (§ 366.26, subd. (*l*)(2).)

15

Section 366.26, subdivision (*l*) and the court rules implementing it "are intended to ensure that resolution of challenges to setting orders are resolved before the section 366.26 hearing. (*Karl S. v. Superior Court* (1995) 34 Cal.App.4th 1397, 1402-1403.) The provision supports ' "[t]he state's interest in expedition and finality" ' and the child's interest in ' "securing a stable, 'normal,' home," ' which goals would be compromised if the validity of issues addressed in the order terminating reunification services and setting the section 366.26 hearing remained undecided until after the court's adoption of a permanent plan. (*In re Anthony B.* (1999) 72 Cal.App.4th 1017, 1022-1023; see *In re Rashad B.* (1999) 76 Cal.App.4th 442, 447 [90 Cal.Rptr.2d 462] ['In adopting section 366.26, subdivision (*l*), " . . . the Legislature has unequivocally expressed its intent that [setting] orders be challenged by writ before the section 366.26 hearing." '].)" (*In re X.Z.* (2013) 221 Cal.App.4th 1243, 1249.)

In the present case, mother did not file a writ petition challenging the juvenile court's May 14, 2013 order terminating her family reunification services and setting a section 366.26 hearing. Therefore, she cannot challenge the order or the findings on which it was based—including the finding that returning K.C. to mother's physical custody would create a substantial risk of detriment to K.C.'s physical or emotional well-being—in this appeal.

Although mother recognizes the general rule requiring the filing of a writ petition, she contends the rule does not apply in the present case. She notes that she "received both a finding from the juvenile court that she was in compliance with her case plan, and an order for conjoint counseling even though her services were technically terminated," and "[t]he juvenile court was still trying to assist [mother] [repair] her relationship with K.C." Under these circumstances, mother urges she was not required to file a writ petition because she "could reasonably infer that a writ petition was unnecessary as the direction of the proceedings was still pointed towards reunification."

We do not agree. As we have said, at the 18-month hearing, mother's attorney said mother had decided to stop fighting for K.C.'s return to give K.C. "stability in her placement and perhaps allow her daughter to relax so that there can be a more natural

16

relationship between the mother and her daughter." Further, counsel said mother understood that by withdrawing her opposition, "the court will proceed to terminate family reunification services, [and] the court will proceed to set a .26 proceeding to determine what a permanent plan would be for her daughter." Mother clarified that she was "not agreeing that I – I want to terminate my rights, my reunification. [¶] . . . I am not agreeing with that. [¶] . . . *But that's what I have to do.*" (Italics added.)

We read this exchange to mean that mother understood that, once she withdrew opposition to K.C.'s continued placement with grandparents, the court would terminate family reunification services and set a hearing to terminate mother's parental rights. The court subsequently told her it was doing exactly that, and it advised mother that she had seven days "to file a writ with the appellate court now that I have made the orders that I have made." Mother did not do so. We therefore reject her contention that her decision to forego a writ challenge to the court's May 14, 2013 orders was not knowingly or intelligently made, and that it therefore should not preclude mother from challenging the juvenile court's finding of detriment in this appeal.

The present case is distinguishable from *In re G.S.R.* (2008) 159 Cal.App.4th 1202 and *In re Frank R.* (2011) 192 Cal.App.4th 532, on which mother relies. In *In re G.S.R.*, the court held that a father did not forfeit the right to appeal the termination of his parental rights by failing to appeal from earlier dispositional orders. The court noted that no allegations had been sustained against the father, who was deemed non-offending (159 Cal.App.4th at p. 1207), and "[w]e cannot see the benefit of a rule that would require a parent to seek appellate review when the allegations against him have been stricken." (*Id.* at p. 1213, fn. 6.) Similarly, in *In re Frank R.*, the court held that a father did not forfeit his right to contest the termination of his parental rights by failing to file a writ petition from the setting of the section 366.26 hearing because the juvenile court did not advise father of his writ rights. (192 Cal.App.4th at p. 539.) In the present case, in contrast, allegations had been sustained against mother, and mother had been specifically advised by her attorney and the court that if she elected not to challenge the May 14 orders, her reunification services would be terminated and a hearing to terminate parental

17

rights would be set. Therefore, there is no fundamental unfairness in enforcing the waiver/forfeiture rule against mother.

## III. Terminating Mother's Parental Rights Was Constitutionally Permissible

Pointing to evidence that she conquered her drug problem and complied with her reunification plan, mother contends her parental rights should not have been terminated because she was a fit parent. We agree, as did the juvenile court, that mother's compliance with her reunification plan was exemplary and that she has maintained her sobriety. For the reasons that follow, however, mother's sobriety and compliance with her reunification plan did not entitle her to regain custody of her daughter under the facts of this case.

### A. *Notwithstanding a Parent's Compliance with a Reunification Plan, California Law Permits Termination of Parental Rights If Returning the Child to the Parent Would Create a Likely Risk of Detriment*

As we have said, section 366.22, subdivision (a) provides that at the 18-month hearing, the juvenile court shall order the return of the child to the physical custody of his or her parent or legal guardian "*unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.*" (Italics added.) The determination required by the juvenile court, therefore, is not whether the parent has fully complied with the reunification plan, but whether returning the child home is likely to cause harm to his or her physical or emotion well-being.

The parent's compliance with the reunification plan is, concededly, an important consideration in the court's evaluation of likely detriment. Indeed, the statute specifically requires that in making its determination of detriment, the juvenile court "shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided." The statute further provides that a parent's failure to participate regularly and make substantive progress in court-ordered treatment programs "shall be prima facie evidence that return

18

would be detrimental." (§ 366.22, subd. (a).) But while the statute says that compliance with the reunification plan is *a* factor in determining detriment, it does not suggest that it is the *only* factor.

The court relied on the statutory language and legislative intent expressed in section 366.22, subdivision (a) to conclude in *In re Joseph B.* (1996) 42 Cal.App.4th 890 that a child should not have been ordered to return to his parent even though the parent had corrected the problem that required court intervention. In that case, Joseph was twice declared a dependent child under section 300, subdivisions (a) and (b), as a result of physical abuse by his mother. The mother substantially complied with the family reunification plan, and by the 18-month review hearing the court found that returning Joseph to his parents would not pose a risk to his physical well-being. However, Joseph said he did not feel safe with his mother, and the social worker opined that returning Joseph to his parents would be detrimental to his emotional well-being. (*In re Joseph B.*, at pp. 893, 896.) The juvenile court made a specific finding that Joseph's mental health would be at risk if he were returned home, but it nonetheless ordered Joseph returned because it believed the statute did not allow the continuation of dependency jurisdiction once the parent had corrected the problem (physical abuse) that created the need for such jurisdiction. (*Id.* at pp. 893-894.)

The Court of Appeal reversed. It explained that nothing in sections 366.21 and 366.22 requires that the "detriment" that justifies continued juvenile court jurisdiction must be the same detriment that necessitated the juvenile court involvement in the first instance. To the contrary, the statute requires only a " 'substantial risk of detriment to the physical or emotional well-being of the minor.' " (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 899.) By authorizing the continued removal of a child from parental custody based on the risk of either physical detriment or emotional detriment, the court said, sections 366.21 and 366.22 focus on the child's well-being *at the time of the review hearing* rather than on the initial basis for juvenile court intervention. In other words, "while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency

19

(§ 366.22, subd. (a)), the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child. (*Ibid.*) [¶] For example, where a child who has been abused physically is experiencing severe emotional trauma as a result of the abuse and from a fear of being returned to parental custody, it would be inconsistent with the well-being of the child to compel his or her return to parental custody even if means are available to protect the child from further physical abuse by the parent." (*In re Joseph B.*, at pp. 899-900.)

The court continued: " 'Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.' (*In re Marilyn H*. (1993) 5 Cal.4th 295, 307.) [¶] California's dependency statutes fulfill this duty by authorizing juvenile court intervention to protect children who are at substantial risk of suffering physical or emotional harm. While the statutory scheme is designed to assist families to 'correct the problems which caused the child to be made a dependent child of the court' (§ 366.1, subd. (d); Stats. 1987, ch. 1485, § 41), its focus remains on the well-being of the child. [Citations.] [¶] Consistent with the purpose of the dependency scheme, the question whether to return a child to parental custody is dictated by the well-being of the child at the time of the review hearing; if returning the child will create a substantial risk of detriment to his or her physical or emotional well-being (§§ 366.21, subds. (e) & (f), 366.22, subd. (a)), placement must continue regardless of whether that detriment mirrors the harm which had required the child's removal from parental custody (§§ 300, subds. (a)-(j), 361, subd. (b))." (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 900.)

In the case before it, the court in *In re Joseph B.* said, the fact that mother had satisfied the requirements of the reunification plan "does not mean she was entitled to custody of the minor regardless of the substantial risk of detriment that reunification would have on the minor's emotional well-being. As we have explained, while a goal of child welfare services provided to the minor and family (§ 361.5) is to help the parents correct problems that caused the minor to be made a dependent child of the court

20

(§ 366.1, subd. (d)), and thus to permit family reunification, the focus of dependency law is on the well-being of the minor. [¶] Hence, the question whether to return a child to parental custody is not governed solely by whether the parent has corrected the problem that required court intervention; rather, the court must consider the effect such return would have on the child. It defies common sense to conclude that a child who has become severely disturbed emotionally as an outgrowth of physical abuse administered by a parent and who will suffer further emotional trauma if compelled to return to parental custody must nonetheless be returned because the parent's successful completion of reunification services indicates further physical abuse is unlikely. In our view, that result is precisely what the Legislature intended to avoid by enacting sections 366.21, subdivisions (e) and (f), and section 366.2, subdivision (a)." (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 901; see also *Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 760 ["compliance with the requirements of a reunification plan does not mandate the return of a minor to parental custody"]; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 71 [mother "seems to think her compliance with the terms of her reunification plan is all that was required for reunification to occur. But that position reflects neither reality nor the law. The juvenile court may decline to return a child to parental custody where, although that parent has complied with the reunification plan, the child continues to suffer severe emotional problems as a result of the parent's earlier abuse and where those problems would be exacerbated by return of the child."].)

The present case is analogous. Although mother fully complied with her reunification plan and ameliorated the problem (substance abuse) that necessitated the juvenile court's exercise of jurisdiction, substantial evidence supported the court's finding that K.C. would be at substantial risk of detriment to her emotional health if she were returned to mother. K.C. repeatedly expressed that she did not trust mother and feared living with her. As the court date approached at which K.C. faced a return to mother, she became increasingly anxious and acted out at home and at school. Under these circumstances, to paraphrase *Joseph B.*, it defies common sense to conclude that a child who has suffered emotional trauma as an outgrowth of neglect by a parent, and who

21

is likely to suffer further emotional trauma if compelled to return to parental custody, must nonetheless be returned because the parent successfully completed reunification services. We decline to reach such a conclusion.

B.     *Terminating Mother's Parental Rights Was Constitutionally Permissible Under the Facts of This Case*

Mother contends that even if terminating her parental rights was permissible under statutory law, it violated federal Constitutional law as articulated in *Santosky v. Kramer* (1982) 455 U.S. 745 (*Santosky*) because the evidence did not permit the conclusion that mother is an unfit parent. Although we agree that the record does not support a finding of present unfitness, we do not agree that terminating mother's rights was inconsistent with the court's analysis in *Santosky*.

*Santosky* considered the constitutionality of a provision of New York's Family Court Act that permitted termination of parental rights upon a finding by a " 'fair preponderance of the evidence' " that a child was " 'permanently neglected.' " (*Santosky*, *supra*, 455 U.S. at p. 747.) The court held that the Due Process Clause requires a higher standard of proof than a preponderance of the evidence: "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." (*Id.* at pp. 747-748.)

*Santosky* did not consider the substantive findings required to terminate parental rights, and thus it is of limited relevance here. That is, while the Supreme Court held that the state must support its allegations against a parent by clear and convincing evidence, it did not address *what* (as opposed to by what standard of proof) the state was required to prove.[2] *Santosky* therefore does not stand for the proposition for which mother cites it—

---

[2]     The statute at issue in *Santosky* required a showing that the state agency " 'made diligent efforts to encourage and strengthen the parental relationship' " and that the parents failed " 'substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so.' " (*Santosky*, *supra*, 455 U.S. at p. 748.) The court did not address the substantive adequacy of this finding as a prerequisite to terminating parental rights.

22

i.e., that the state may not terminate parental rights unless it proves the parent is unfit as of the date of the termination order. Indeed, *Santosky* suggested to the contrary, stating: "After the State has established parental unfitness at [an] initial proceeding, the court may assume at the dispositional stage that the interests of the child and the natural parents . . . diverge." (*Santosky*, *supra*, 455 U.S. at p. 760, italics omitted.)

The California case on which mother relies is similarly distinguishable. In *In re P.C.* (2008) 165 Cal.App.4th 98, children were removed from the parents due to physical abuse. At the 18-month hearing, the juvenile court found that mother had regularly visited the children and substantially complied with her reunification plan, but that returning the children to mother would create a substantial risk of detriment because mother had not been able to obtain appropriate housing. (*Id.* at pp. 101-102.) The Court of Appeal reversed, concluding that "poverty alone—even when it results in homelessness or less than ideal housing arrangements—[is not] a sufficient ground to deprive a mother of parental rights to her children." (*Id.* at pp. 99-100.)

The present case is not analogous to *In re P.C.* In that case, the "detriment" to the children was solely economic and therefore could be avoided with state financial assistance. The detriment in the present case is quite different and is not easily ameliorated: As a result of trauma K.C. experienced as a young child, she distrusts mother and feels anxious and unsafe in her presence. Counseling has helped K.C. deal with her anxiety, but has not eliminated it. Moreover, unlike *In re P.C.*, K.C.'s emotional detriment is the result of mother's actions that led to the initiation of these dependency proceedings. The constitutional deficiency identified in *In re P.C.*, therefore, is not present here.

## DISPOSITION

The orders of the juvenile court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



KITCHING, J.



ALDRICH, J.